## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| THE ARBITRAGE EVENT-DRIVEN FUND, on behalf of itself and all others similarly situated, | CIVIL ACTION NO.    18-6175 |
| Plaintiff, |  |
| vs. | CLASS ACTION COMPLAINT |
| TRIBUNE MEDIA COMPANY, PETER KERN, CHANDLER BIGELOW, AND EDWARD P. LAZARUS, | JURY TRIAL DEMANDED |
| Defendants. |  |

## INTRODUCTION

Plaintiff The Arbitrage Event-Driven Fund ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and other public statements issued by defendant Tribune Media Company ("Tribune" or the "Company"), media and analyst reports about the Company, publicly available information in *Tribune Media Company v. Sinclair Broadcast Group, Inc.*, C.A. No. 2018-0593-JTL (Del. Ch.) (the "Contract Litigation"), and other public information regarding the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      On July 16, 2018, Federal Communications Commission ("FCC") Chairman Ajit Pai issued a statement expressing "serious concerns" about a well-publicized prospective merger

announced in May 2017 (the "Merger") between Tribune and Sinclair Broadcasting Group, Inc. ("Sinclair"). In particular, Chairman Pai stated that "certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law."

2.      Put another way, Sinclair had proposed to the FCC a plan – which it turns out had been repeatedly rejected – under which Sinclair would still control stations that it was otherwise required to sell to comply with FCC regulations. This signal that Sinclair was not agreeing to the regulatory requirements necessary to complete the Merger – the station divestitures discussed frequently in Tribune's public filings since May 2017 – caused Tribune stock to close down $6.44 per share (over 16%), costing investors more than $564 million in value.

3.      This class action is brought against Tribune and certain of its senior management (the "Defendants") based on misrepresentations and omissions of material fact made by Defendants in Tribune's public filings concerning Sinclair's conduct during the regulatory approval process necessary to complete the Merger. Specifically, during the class period (as defined below), as Defendants frequently discussed the regulatory steps necessary to complete the Merger in public statements and presentations, they misstated or omitted the following facts concerning Sinclair's publicly-reported (purported) agreement to divest certain television stations in markets necessary to satisfy FCC regulations:

(a)      Sinclair was in fact refusing to divest itself of television stations in certain markets that it had previously purportedly agreed to sell to secure regulatory approval for the Merger; and

(b)      In direct contradiction to Tribune's public statements, the Company knew that Sinclair was in fact taking the position that it was not legally or contractually obligated to complete the identified divestitures to ensure regulatory approval.

4.      This action is brought on behalf of all individuals and entities (except Defendants

2

and their affiliates) who purchased shares of Tribune's common stock from November 29, 2017 through July 16, 2018, inclusive (collectively the "Class Period"). The claims asserted herein are alleged against Tribune and certain of its senior executives, for their violations of Sections 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

### A. Overview of the Merger

5. In early 2016, Tribune's board of directors announced that Tribune had initiated a review of strategic options to maximize shareholder value, *i.e.* was considering a sale of the company. A year later, Tribune's strategic review led to, among other things, discussions with Sinclair about a possible acquisition.

6. On March 1, 2017, Reuters reported that Sinclair executives had approached Tribune about a possible acquisition, causing Tribune stock to close up 5.8 percent, at $38.75 per share. On May 8, 2017, following approximately six months of confidential negotiations, Sinclair and Tribune announced an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which each share of Tribune stock would be converted into the right to receive $35 in cash plus 0.23 shares of Sinclair Class A common stock, for a total value of $43.50 per share. Following the announcement, Tribune stock closed up another 5.2 percent, at $42.40 per share.

7. Sinclair owns more television stations than any company in the United States – approximately 193 stations in 80 markets. Tribune owns 42 stations in 33 markets. Accordingly, given the FCC's rules concerning multiple-ownership of stations in the same market, Sinclair's ability to gain regulatory approval immediately became a topic of concern to the market.

8. Indeed, Tribune and Sinclair were well aware that a combination of the two companies would trigger regulatory scrutiny by both the United States Department of Justice (the

"DOJ") and the Federal Communications Commission (the "FCC"). In fact, the Merger Agreement required Sinclair to use its "best efforts" to gain regulatory approval of the Merger, including but not limited to "Station Divestitures" in certain markets to comply with FCC regulations.

9.      In this regard, Tribune's May 8, 2017 press release announcing the Merger assured the market that, while the Merger was contingent upon "approval by the Federal Communications Commission ("FCC"), and antitrust clearance," in "order to comply with FCC ownership requirements and antitrust regulations, Sinclair may sell certain stations in markets where it currently owns stations." Tribune filed a Form 8-K with the SEC the next day, May 9, 2017. Tribune attached the Merger Agreement to its Form 8-K, and explicitly incorporated it therein by reference. When referring to Station Divestitures, the Merger Agreement expressly provided that Sinclair was willing "promptly to effect the sale, lease, license, disposal and holding separate of, such assets, rights, product lines, categories of assets or businesses or other operations or interests therein."

10.     The market reacted favorably. All told, on May 8, 2017, the price of Tribune stock closed up 15.9 percent from its closing price on February 28, 2017, the day before speculation about the possible deal with Sinclair was first reported in the media.

11.     Unbeknownst to Tribune's shareholders, Sinclair did not intend to proceed with the station divestitures – even in the markets where it had confidentially agreed with Tribune that it would sell them – regardless of whether government regulators determined that those sales were necessary to comply with FCC ownership requirements and antitrust regulations. Rather, Sinclair intended to take the position that it was permitted, under the Merger Agreement, to contest the conclusions of government regulators even to the point of litigation against the

4

government.  Sinclair's planned obstinance presented a significant risk that the Merger would be substantially delayed, or that it would not be consummated at all.

12.    Recognizing that regulatory approval was critical to the proposed Merger, Tribune again assured investors in its September 6, 2017 proxy solicitation requesting shareholder approval of the Merger Agreement that "Sinclair also agreed, subject to the terms of the agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions, each referred to as an 'approval action,' to obtain regulatory approval."  Tribune further disclosed the ten specific markets in which Sinclair had agreed to make station divestitures in order to obtain regulatory approval – divestitures which the DOJ staff later deemed sufficient to obtain antitrust clearance had Sinclair proceeded with their agreement to do so.

### B.    Overview of Defendants' Misstatements and Omissions

13.    However, according to Tribune's own complaint in the Contract Action, contrary to Tribune's assurances, "from virtually the moment the Merger Agreement was signed, Sinclair . . . engaged in belligerent and unnecessarily protracted negotiations with DOJ and the FCC over regulatory requirements" and "refused to sell stations in the ten specified markets required to obtain approval."

14.    Moreover, by no later than November 20, 2017, Tribune knew that Sinclair was flatly refusing to comply with a DOJ demand to divest stations in the agreed markets.  On November 17, 2017, the DOJ rejected Sinclair's arguments that it was not required to divest stations and informed both Sinclair and Tribune by phone of its position that divestitures would be required in eight-to-ten of the agreed markets.  Three days later, the DOJ rejected a request from Sinclair to pause the DOJ's investigation into the Merger unless Sinclair put station

divestitures on the table. Instead, the DOJ commenced depositions of Sinclair and Tribune personnel immediately following Sinclair's November 20, 2017 refusal to consider divesting stations in the agreed markets.

15. Defendants were aware of these developments because (i) Sinclair was contractually required to keep Tribune apprised of its conversations with government regulators regarding the Merger and did keep Tribune so apprised, and (ii) government regulators communicated directly with Tribune regarding their communications with Sinclair. As demonstrated by Tribune's description of Sinclair's conduct toward regulators (recounted in a private December 18, 2017 letter), Tribune believed that Sinclair's conduct was inconsistent with its obligations under the Merger Agreement. Defendants thereby knew – if they did not already know – information substantially calling into question whether the Merger would be consummated timely, or at all.

16. Put another way, Tribune unquestionably knew by the beginning of the Class Period on November 29, 2017: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures.

17. Despite the fact that Defendants learned of material facts inconsistent with Tribune's statements in its May 8 press release and its September 6 proxy statement to the effect that Sinclair would willingly make station divestitures as required to obtain regulatory approval, Defendants failed to correct those statements or reveal the newly-learned facts. Rather, Defendants repeated their previous misstatements.

18. On November 29, 2017, Tribune filed a Form S-3 registration statement related to the offering of more than 7 million shares of its stock by Oaktree Tribune, L.P., Tribune's largest

6

single shareholder. In the Prospectus filed with that registration statement, Tribune repeated statements concerning Sinclair's purported agreement to divest stations in certain markets to achieve regulatory approval, and indeed even specifically and publicly listed those markets in the registration statement. The Prospectus further stated: "We currently anticipate the Merger will close late in the first quarter of fiscal 2018 or soon thereafter" (*i.e.*, before the end of March 2018).

19. Sinclair's obstinacy in its dealings with government regulators became more apparent and alarming to Tribune over the next several weeks. Sinclair rejected a December 13, 2017 DOJ offer to pause its investigation if Sinclair would put station divestitures in seven of the agreed-to markets "on the table." Sinclair likewise rejected a December 15, 2017 offer by the DOJ to end the investigation and provide "immediate clearance" for the Merger to proceed if Sinclair would divest stations in the ten markets listed in Tribune's September 6 and November 29 public statements.

20. Alarmed, by December 18, 2017, Defendant Edward Lazarus, Tribune's General Counsel and Chief Strategy Officer, wrote to Sinclair's General Counsel, expressing Tribune's "serious concern with Sinclair's approach to obtaining the Department of Justice's clearance." Defendant Lazarus stated that the Merger Agreement required Sinclair to accept the DOJ's offer, a position consistent with Tribune's previous public statements about the Merger Agreement. Sinclair's General Counsel refused to comply in a letter dated the same day, and further stated in a December 21 email to Lazarus that "we disagree . . . with your legal conclusions." Sinclair then sent an aggressive and insulting letter to the DOJ, refusing to offer divestitures and inviting litigation.

21. Despite these developments, Tribune made no effort to inform shareholders that

the statements in its May 8, 2017 press release, its September 6, 2017 proxy statement and its November 29, 2017 registration statement were false, incomplete, and misleading. At the very least, Tribune had an obligation to inform its shareholders: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures. Tribune also failed to advise its shareholders that Sinclair and Tribune explicitly disagreed about the contours of Sinclair's obligations to take steps necessary to complete the Merger.

22.     Throughout January and February of 2018, Sinclair's posture toward government regulators became even more confrontational, and its exchanges with Tribune even more adversarial. Sinclair repeatedly refused the DOJ's offers to end its investigation if Sinclair would commit to divestitures in the ten markets listed in Tribune's SEC filings, and similarly refused alternative offers that would have halted the investigation while Sinclair and regulators discussed specifics in good faith. Further alarming Tribune, but undisclosed to the public, Sinclair repeatedly disclaimed that it had a contractual obligation to Tribune to commit to the divestitures, expressly informing Tribune that it disagreed with Tribune's "legal conclusions" in that regard.

23.     Shortly before the January 25, 2018 closing meeting among the DOJ staff, Sinclair, and Tribune, at which time the government typically decides whether to grant antitrust clearance or pursue litigation, Tribune reminded Sinclair that Sinclair was obligated to accept the DOJ's offer to grant clearance in return for Sinclair's commitment to make divestitures in the ten agreed-to markets. Sinclair responded to Tribune expressly stating that Sinclair had no such obligations, and, when the DOJ repeated the offer, Sinclair's General Counsel rejected the offer and told the DOJ staff: "sue me."

8

24.     Tribune knew that Sinclair's conduct put the Merger in further jeopardy, and that Sinclair intended to further jeopardize the Merger through continued obstinance and antagonism in response to government regulators. Yet Tribune still did not inform its shareholders: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; or (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures. Even as Tribune twice threatened to sue Sinclair if Sinclair did not comply with its obligations (on February 9 and 14) Tribune did not disclose the circumstances that necessitated those threats, much less the fact that litigation was imminent.

25.     Meanwhile, the FCC – whose approval was also required to consummate the Merger – informed Sinclair and Tribune that Sinclair's proposed approach to making the divestitures required to satisfy the FCC through a contingent divestiture trust was unlikely to be approved. Sinclair responded by submitting an amended but similar application on February 20, 2018 which also proposed the use of a contingent divestiture trust. The FCC rejected this proposal a mere two weeks later in a decision that Tribune has since publicly characterized as "unsurprising."

26.     In addition, Sinclair was required to propose to the FCC specific station sales in order to satisfy the rule that limits entities from owning or controlling television stations that, together, have an aggregate "national audience reach" that exceeds 39 percent of U.S. television households (the "National Cap"). Because the National Cap limits the total number of television stations one company can own by applying a simple numeric restriction on the percentage of television households it can reach, Sinclair could have met the Cap through myriad different combinations of station divestitures. These divestiture combinations could easily have been

commercially reasonable, provoked little public opposition, and been quickly approved by the FCC.

27.     Instead, Sinclair waited until late February 2018 to even begin the process of preparing such sales, and when it did so, it included sales both (i) to parties that had significant ties to Sinclair's Executive Chairman, David Smith, and his family and (ii) subject to arrangements in which Sinclair would effectively operate the divested stations.  Tribune warned Sinclair that its proposal of such transactions made FCC approval less likely and requested that Sinclair propose "clean" transactions instead.

28.     Despite Tribune's growing privately-expressed alarm, and despite further statements and actions by Sinclair demonstrating that regulatory approval for the Merger was at risk, Tribune still did not disclose: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; or (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures.  Tribune not only failed to correct its May 8, September 6, and November 29, 2017 statements, it largely *repeated* them and made further false and misleading statements about the Merger Agreement and Sinclair's efforts to obtain regulatory approval in its Form 10-K for 2017, publicly filed with the SEC on March 1, 2018.  Tribune further stated in that filing: "We currently anticipate the Merger will close in the second quarter of fiscal 2018."

29.     In other words, rather than disclose: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; or (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures, Tribune assured the investing public *again* that, pursuant to the confidential disclosure memorandum, Sinclair had

agreed to sell stations as required to obtain regulatory approval and that process was proceeding apace.

### C. Overview of the Harm to Tribune Shareholders

30.     Defendants' misstatements and omissions concealed from the market facts unquestionably known by Tribune that presented a material risk that the Merger would not obtain regulatory approval and would therefore fail.  Plaintiff and other investors therefore purchased shares of Tribune stock at inflated prices during the Class Period.   But for Defendants' misstatements and omissions, the investors would not have purchased Tribune stock, or would not have done so at the inflated prices caused by the misstatements and omissions.

31.     When the previously concealed risk that regulators would decline to grant approval, and the Merger would therefore fail, materialized, the price of Tribune stock declined dramatically, and Plaintiff and other investors lost hundreds of millions of dollars.

32.     That Sinclair may now suggest in hindsight that the Merger might have been approved after an agreed further extension does not change the facts Sinclair was taking action antagonistic to the government's position which jeopardized and ultimately derailed the Merger, and that Tribune knew and failed to disclose those facts.

33.     Notably, Plaintiff does not allege that Tribune set out to defraud the market or its shareholders when the Merger was announced in May 2017, but Plaintiff need not prove such initial intent to defraud to show that Defendants violated Sections 10(b) and 20(a) of the Exchange Act during the Class Period that commenced in November 2017.  It is enough, as the facts demonstrate, to show that Defendants failed to correct, continued to misstate, and continued to omit, material facts when they learned: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures.  Defendants were motivated by,

among other things, maintaining the inflation in Tribune stock price caused by the Merger announcement on the meager hope that the Merger would receive regulatory approval despite Sinclair's intransigence.

## JURISDICTION AND VENUE

34. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

35. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

36. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

37. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

38. Plaintiff The Arbitrage Event-Driven Fund is a multi-strategy fund which invests in the equity and debt instruments of companies involved in corporate events. Plaintiff and its registered investment manager, Water Island Capital LLC, is headquartered in New York, New York. As set forth in the attached certification, Plaintiff purchased shares of Tribune stock and

suffered damages as a result of the violations of the federal securities laws alleged herein.

39.     Defendant Tribune is a Delaware corporation with its principal executive offices located at 515 North State Street, Chicago, Illinois.  Tribune is a media company with a diverse portfolio of television and digital properties.  It owns or operates 42 local television stations in 33 markets.  It also owns national entertainment network WGN America, digital multicast network Antenna TV, Tribune Studios, WGN-Radio, minority stakes in the TV Food Network and CareerBuilder, and a variety of real estate assets.  Tribune stock is traded on the New York Stock Exchange under the ticker symbol "TRCO."  As of August 9, 2018 (the day after Tribune abandoned the Merger) there were over 87.6 million shares of Tribune common stock outstanding.

40.     Defendant CEO Kern has served as Chief Executive Officer of Tribune since March of 2017.  He had previously been appointed to Tribune's board in October, 2016.

41.     Defendant Chandler Bigelow has been Tribune's Chief Financial Officer and Executive Vice President since February 2016.  Bigelow previously served as the company's Chief Business Strategies and Operations Officer from June 2013 until the time of his appointment as CFO.

42.     Defendant Edward P. Lazarus has served as Tribune's General Counsel and Executive Vice President since January 2013.  In February 2016 he assumed the additional title and duties of Chief Strategy Officer.  He previously served as Chief of Staff to the Chairman of the Federal Communications Commission, Julius Genachowski, from June 2009 to February 2012.

## SUBSTANTIVE ALLEGATIONS

### A.    Background of Tribune

43.     Tribune is one of the largest television broadcasting companies, owning 39

television stations across the United States and operating three additional stations through local marketing agreements; it also owns national basic cable channel/superstation WGN America, regional cable news channel Chicagoland Television (CLTV) and Chicago radio station WGN. Its investment interests include the Food Network (which the company maintains a 31% ownership interest).

44.     The Company was founded under the name The Tribune Company in 1847 as the publisher of the Chicago Daily Tribune.  The Company began publishing a second newspaper, a tabloid called the New York News, in 1919.  The Company entered radio broadcasting in 1924 and entered the television industry in 1948.  Following growth both in print and broadcasting, the Company became a public firm in 1983.

45.     The Company was taken private in December of 2007.  In December of 2008, the Company filed for Chapter 11 bankruptcy protection.  On July 13, 2012, the Tribune Company received approval of a reorganization plan to allow the company to emerge from Chapter 11 bankruptcy protection.  At that time, company stock began trading as an over-the-counter security.  On August 4, 2014, Tribune Company completed the spin-off of its newspaper publishing division as a separate public company named Tribune Publishing Company with the parent being renamed Tribune Media Company.  In December 2014, over-the-counter trading ceased, and the Company's stock began trading on the New York Stock Exchange under the symbol TRCO.

**B.     Tribune's Management Position the Company for Sale and Negotiate and Announce a Definitive Merger Agreement with Sinclair**

46.     On February 29, 2016, Tribune announced that the "Board of Directors and the Company have initiated a process to explore the full range of strategic and financial alternatives to enhance shareholder value." These alternatives included seeking a merger or sale of the

14

Company.  Investors reacted positively to this announcement.  Tribune's share price rose 9%, closing at $35.90 per share that day, up from $32.95 at close on the previous trading day (February 26).  Tribune's share price rose again the next day, closing at $37.91 on March 1, 2016, up more than 15% from its close on the day before the announcement.

47.     Tribune and its board of directors did indeed explore opportunities to sell the company throughout the remainder of 2016, and negotiations regarding a possible acquisition by Sinclair began in earnest by at least November, 2016.

48.     On March 1, 2017, Reuters reported that Sinclair executives had approached Tribune about a possible acquisition.  Investors responded positively to the news, and Tribune stock rose 8%, closing at $37.38 per share that day, up from $34.52 at close on the previous day. Within a month of Tribune's announcement indicating that it might seek to sell the company, Defendants Bigelow and Lazarus were appointed Chief Financial Officer, and Chief Strategy Officer respectively.  After negotiations between Tribune and Sinclair were underway, Tribune appointed Defendant Kern (collectively with Defendants Bigelow and Lazarus, the "Individual Defendants") as interim Chief Executive Officer.  Tribune's public message to (and regarding) the Individual Defendants was clear: the Individual Defendants had been engaged to sell the Company.

49.     On May 8, 2017, Tribune announced that it had entered into the Merger Agreement with Sinclair, pursuant to which Sinclair would acquire Tribune's outstanding stock and Tribune shareholders would receive cash plus Sinclair stock for a total value of $43.50 per share, based on Sinclair's stock price at the time.  Investors reacted positively to the news and Tribune stock price closed at $42.40 per share on May 8, 2017, up 5% from $40.29 at close on the previous trading day, up more than 22% from its close on February 28, 2017, the day before

15

the negotiations were reported in the media, and up more than 28% from the day before management announced the strategic review.

50.     As Defendant Kern explained in the May 8, 2018 press release, the announcement of a definitive merger agreement with Sinclair was "the culmination of an extensive strategic review, which has delivered significant value to our stockholders." Kern's statement confirms that the "extensive strategic review" he refers to is the strategic review that Tribune announced in February 2016, "15 months ago."

**C.     Defendants' Misleading Statements and Omitted Material Facts Concerning Sinclair's Purported Agreement to Sell Stations as Necessary to Obtain Regulatory Approval**

51.     As multiple analysts explained when the Merger Agreement was announced, and as Tribune and Sinclair openly discussed in their regulatory filings concerning the Merger, a combination of the two companies would trigger regulatory scrutiny by both the DOJ and the FCC.

52.     Understanding that its investors and prospective investors would be concerned about such regulatory approval, Tribune immediately sought to allay those concerns. In its May 8, 2017 press release, Tribune explained that, "In order to comply with FCC ownership requirements and antitrust regulations, Sinclair may sell certain stations in markets where it currently owns stations. Such divestitures will be determined through the regulatory approval process." This statement led investors to believe: (i) that Sinclair would make the station divestitures required to obtain regulatory approval; and (ii) that Sinclair agreed with Tribune that Sinclair was legally obligated to do so.

53.     The next day, May 9, 2017, Tribune publicly filed its Form 8-K announcing the Merger Agreement with the SEC. The form 8-K attached as exhibits Tribune's May 8, 2017 press release and the Merger Agreement itself. The Merger Agreement contained specific

obligations by Sinclair to make Station Divestitures to secure regulatory approval:

> [Sinclair] shall use reasonable best efforts to take action to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably practicable, including . . . the proffer and agreement by [Sinclair] of its willingness to sell, lease, license or otherwise dispose of, or hold separate pending such disposition, and promptly to effect the sale, lease, license, disposal and holding separate of, such assets, rights, product lines, categories of assets or businesses or other operations or interests therein of [Sinclair] or any of its Subsidiaries [ ] (hereinafter referred to as the "Station Divestitures") and . . . the proffer and agreement by [Sinclair] of its willingness to take such other actions, and promptly to effect such other actions (and the entry into agreements with, and submission to orders of, the relevant Governmental Authority giving effect thereto, including the entry into hold separate arrangements, terminating, assigning or modifying Contracts (or portions thereof) or other business relationships, accepting restrictions on business operations and entering into commitments and obligations) (each an "Approval Action").

54.     As is customary, and as explained in the Merger Agreement itself, the publicly-filed Merger Agreement incorporated by reference a Confidential Memorandum signed by both Tribune and Sinclair, which contained additional disclosures, representations and warrantees that Tribune and Sinclair made to each other as part of the Merger Agreement, but which they chose not to make public at that time.

55.     However, unbeknownst the public, as Tribune later revealed in its August 9, 2018 verified complaint against Sinclair in the Contract Litigation, "from virtually the moment the Merger Agreement was signed, Sinclair repeatedly and willfully breached its contractual obligations in spectacular fashion."  These breaches related to Sinclair's obligation to divest stations in order obtain regulatory approval for the Merger.  As Tribune has averred in its verified complaint in the Contract Litigation, after signing the Merger Agreement, "Sinclair repeatedly favored its own financial interests over its contractual obligations by rejecting clear

17

paths to regulatory approval. Instead, Sinclair fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell [to obtain antitrust clearance]."

56.     Tribune did not inform the investing public that Sinclair was breaching the Merger Agreement by refusing to make station divestitures, information that was necessary to correct the misimpression given by the May 8 press release that Sinclair would willingly make divestitures as needed to obtain prompt regulatory approval. Rather, Tribune doubled down by making stronger and more specific claims about Sinclair's obligation to cooperate with regulators and Sinclair's intention in this regard in its September 6, 2017 proxy statement, inviting its shareholders to vote on the proposed Merger.

57.     In its proxy statement, Tribune stated:

> Under the merger agreement, Sinclair and Tribune each agreed, subject to the terms of the merger agreement, to use its reasonable best efforts, to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable law to complete the merger and the other transactions contemplated by the merger agreement as promptly as reasonably practicable.

> Sinclair also agreed, subject to the terms of the agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions, each referred to as an "approval action," to obtain regulatory approval.

> In that connection Sinclair agreed to divest one or more television stations in the following Nielsen "Designated Market Areas": (i) Seattle-Tacoma, Washington, (ii) St. Louis, Missouri, (iii) Salt Lake City, Utah, (iv) Grand Rapids-Kalamazoo-Battle Creek, Michigan, (v) Oklahoma City, Oklahoma, (vi) Wilkes Barre-Scranton, Pennsylvania, (vii) Richmond-Petersburg, Virginia, (viii) Des Moines-Ames, Iowa, (ix) Harrisburg-Lancaster-Lebanon-York, Pennsylvania and (x) Greensboro-High Point Salem, North Carolina, which we refer to as the "overlap markets", as necessary

to comply with the FCC's Local Television Multiple Ownership Rule (47 C.F.R. § 73.3555(b)), which we refer to as the "FCC duopoly rule," or to obtain clearance under the HSR Act, in each case as required by the applicable governmental authority in order to obtain approval of and consummate the transactions. Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each overlap market, as required by and subject to approval by the relevant governmental authority. Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)), which we refer to as the "FCC national cap," as required by the FCC in order to obtain approval of and consummate the transactions.

58.     Notably, Defendants failed to correct this statement when they learned no later than November 20, 2017: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures.

        *1.     Tribune Learns that Sinclair Is Refusing to Make the Previously-Agreed-To Divestitures, but Continues to Assure Investors that Sinclair Intends to Do So*

59.     On November 17, 2017, DOJ staff sent Sinclair a letter stating that none of Sinclair's arguments had persuaded them as to any of the Overlap DMAs.  That same day, the DOJ's Principal Deputy Assistant Attorney General called Sinclair's antitrust counsel (Mr. Kolasky) and Tribune's outside regulatory counsel, and conveyed the DOJ's official position that the DOJ's concerns with the Merger could be resolved if Sinclair agreed to divest stations in eight to ten of the Overlap DMAs.

60.     The DOJ's position was consistent with Tribune's expectation, expressed in and implied by the Merger Agreement, the Disclosure Memorandum at Schedule 7.1, and Tribune's prior public statements regarding the same, that the DOJ would require station divestitures in order to grant antitrust clearance through the regulatory process and that Sinclair's commitment

to divest stations in up to ten markets would satisfy the DOJ's requirement.

61. Defendants had understood, and had led investors to understand, that Sinclair would accept any offer by the DOJ to grant antitrust clearance in return for divestures in the agreed-to and explicitly-listed markets. The DOJ's November 17, 2017 communication was such an offer.

62. But Sinclair rejected the DOJ's November 17, 2017 offer, and on November 20, 2017, the DOJ refused to pause its investigatory depositions, which were set to begin that week, unless and until Sinclair "put station divestitures on the table." Sinclair refused to even put station divestitures on the table, and thereby caused the investigatory depositions to go forward.

63. Tribune considered Sinclair's rejection of the DOJ's November 17 offer and refusal to put station divestitures on the table to be inconsistent with Sinclair's obligations under the Merger Agreement. Tribune formally memorialized this opinion in a December 18, 2017 letter from Defendant Lazarus to Sinclair's general counsel, copying the chief executives and outside counsel for both Tribune and Sinclair. Given the importance of the content of the letter and the detailed analysis therein, Tribune must have come to this conclusion well before the letter was sent, because the letter would have been reviewed by the senior executives and by outside and internal counsel for Tribune. Further, Sinclair made a detailed response the same day, denying that it was obligated to accept the DOJ's offer or otherwise cooperate with regulators, indicating that Tribune had previously expressed the opinions in its letter to Sinclair and that Sinclair had previously considered and rejected Tribune's analysis after consulting its own counsel.

64. If Defendants had not previously known that the statements in Tribune's September 6, 2017 proxy statement regarding Sinclair's intentions to divest stations were false

and misleading, they learned that those statements were false on or about November 20, 2017, because Sinclair blatantly acted inconsistently with the obligations and intentions ascribed to it in those statements.

65. Still, Defendants did not correct Tribune's September 6, 2017 misstatement by disclosing to the investing public that Sinclair had violated an important provision of its agreement with Tribune, a breach which put the Merger in jeopardy. Rather, Tribune *repeated* the substance of those statements in a Prospectus attached to its Form S-3 Registration Statement filed with the SEC on November 29, 2017. The Prospectus states:

> Under the Merger Agreement, Sinclair and Tribune each agreed, subject to the terms of the Merger Agreement, to use its reasonable best efforts, to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable law to complete the Merger and the other transactions contemplated by the Merger Agreement as promptly as reasonably practicable. Sinclair also agreed, subject to the terms of the Merger Agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions (each, an "approval action") to obtain regulatory approval. In that connection Sinclair agreed to divest one or more television stations in the following Nielsen "Designated Market Areas": (i) Seattle-Tacoma, Washington, (ii) St. Louis, Missouri, (iii) Salt Lake City, Utah, (iv) Grand Rapids-Kalamazoo-Battle Creek, Michigan, (v) Oklahoma City, Oklahoma, (vi) Wilkes Barre-Scranton, Pennsylvania, (vii) Richmond-Petersburg, Virginia, (viii) Des Moines-Ames, Iowa, (ix) Harrisburg-Lancaster-Lebanon-York, Pennsylvania and (x) Greensboro-High Point Salem, North Carolina (collectively, the "overlap markets") as necessary to comply with the FCC's Local Television Multiple Ownership Rule (47 C.F.R. § 73.3555(b)) (the "FCC duopoly rule") or to obtain clearance under the HSR Act, in each case as required by the applicable governmental authority in order to obtain approval of and consummate the Merger. Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each overlap market, as required by and subject to approval by the relevant governmental authority. Sinclair has also agreed to designate, at its

> option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the, FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)) (the "FCC national cap") as required by the FCC in order to obtain approval of and consummate the Merger.

66.     These statements were false and misleading, and omitted material facts necessary to make the statements not misleading, because Defendants knew no later than November 20, 2017: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures.

67.     While the Prospectus correctly recognized that "[f]ailure to obtain the necessary governmental approvals and consents would prevent the parties from consummating the proposed Merger," the Prospectus makes the further misleading statement that: "[t]here can be no assurance that the actions Sinclair is required to take under the Merger Agreement to obtain the governmental approvals and consents necessary to complete the Merger will be sufficient to obtain such approvals and consents or that the divestitures contemplated by the Merger Agreement to obtain necessary governmental approvals and consents will be completed."  This statement was misleading, and omitted material facts necessary to make the statement not misleading, because it implied to the public: (i) that Sinclair would make the station divestitures required by government regulators; and (ii) that Sinclair agreed that it was legally or contractually obligated to do so.

68.     Defendants did not disclose that Sinclair had recently refused to commit to divestitures in eight of the ten listed markets even when the DOJ offered to grant antitrust clearance in return, conduct that Tribune considered a breach of the Merger Agreement.  Nor did Defendants disclose that Sinclair had further refused to even "put station divestitures on the table" and had thereby necessitated investigatory depositions which would delay and jeopardize

regulatory approval. These omissions further rendered Tribune's statements in November 29, 2017 Prospectus false and misleading.

69.     The Prospectus was further misleading because, given Sinclair's conduct before the DOJ, and the attendant delays in both antitrust clearance and FCC approval, it was not reasonable to anticipate that the Merger would close in the first quarter of fiscal 2018, or soon thereafter, as stated in the Prospectus.

70.     Sinclair's failure to make station divestitures as required to obtain regulatory approval continued despite Tribune's protestations. In mid-January, DOJ staff, on a call with Mr. Kolasky, again communicated that the DOJ was considering divestitures only in the Overlap DMAs and not in any other markets. On January 24, 2018, in an email to the assistant attorney general in charge of the antitrust investigation and other DOJ staff, Mr. Kolasky wrote that the DOJ had told Sinclair that it was focused just on the ten markets described in Tribune's public statements as agreed-to and that a sale of additional stations in other markets was not a condition to any settlement. Also on January 24, 2018, Tribune once again urged Sinclair to comply with its obligations under the Merger Agreement in an email sent by Defendant Peter Kern, Tribune's CEO, to Sinclair's CEO on January 24, the day before what was intended to be Sinclair's final front office meeting with the DOJ, which is typically the last official meeting with the DOJ before the DOJ concludes its investigation and decides whether to sue. Mr. Kern wrote, in relevant part:

> While I know you are well aware of our position and your contractual obligations, and at the risk of belaboring the point – in the event DOJ offers to end its investigation if Sinclair agrees to divest stations within the ten overlap DMAs spelled out in the merger agreement, you are contractually bound to accept.

71.     Sinclair's CEO responded the same day, writing only that: "Although I do not

think it is productive to engage in a legal debate with you, for the record I am writing to advise you that we disagree with the legal conclusion stated in your email as to Sinclair's contractual obligations."

72.     As expected, the DOJ offered at the January 25 meeting to end its investigation upon Sinclair's agreement to divest stations within the ten Overlap DMAs.  As in November and December, however, Sinclair refused to agree to divestitures in all ten of the Overlap DMAs.  It offered sales in just four DMAs and declared that it intended, and indeed welcomed the opportunity, to litigate with the DOJ.  Underscoring Sinclair's willful breach, Sinclair's general counsel in fact told the Assistant Attorney General in charge of the investigation: "sue me." Before leaving the DOJ's office after the meeting, Sinclair's general counsel also told Defendant Lazarus that Tribune would have to sue Sinclair to get it to divest stations in all ten markets previously described in Tribune's public filings as agreed-to.

73.     Defendants were aware of this conduct because Tribune's representatives attended the January 25 meeting.  Defendants considered Sinclair's conduct at the meeting a further breach of the Merger Agreement that would delay and jeopardize the consummation of the Merger Agreement.

        2.     *Tribune Learns that Sinclair is Proposing a Divestiture Process that the FCC has Never Approved, And Related-Party ("Sham") Transactions that the FCC was Unlikely to Approve Further Jeopardizing the Merger*

74.     Sinclair created yet more problems, including those that ultimately defeated the transaction, when it purported to identify specific stations to be divested to comply with the National Cap.  Sinclair could have readily complied with the rule in a variety of non-controversial ways, including by simply agreeing to sell certain stations to unrelated third parties in truly arm's-length transactions.

75.     But, rather than take this more certain and expeditious route to deal approval,

which Tribune had publicly stated Sinclair was obligated to take, Sinclair decided in February 2018 to take another high-risk approach. In a proposal that Sinclair submitted to the FCC on February 20, 2018 and supplemented on February 27, 2018, Sinclair proposed station sales to parties with significant ties to Sinclair's Executive Chairman, David Smith, and his family, coupled with joint sales and shared services agreements under which Sinclair would effectively control all aspects of station operations, including advertising sales and the negotiation of retransmission agreements with cable and satellite operators. Under these proposed arrangements, Sinclair would continue to reap the lion's share of the economic benefits of the stations it was purportedly "divesting" and would have an option to repurchase the stations in the future.

76.     Sinclair proposed, among other things, selling WGN-TV in Chicago to Steven Fader, a close associate of Smith's who had no experience in broadcasting. Sinclair also proposed the sale of WPIX, a New York station, to Cunningham Broadcasting Corporation, a company that owns numerous television stations that are operated by Sinclair employees under joint sales and shared services agreements, had tens of millions of dollars in debt guaranteed by Sinclair, and had been controlled by the estate of Smith's late mother until January 2018.

77.     Tribune warned Sinclair that proposing these related-party "sales" was incompatible with using best efforts to obtain prompt regulatory approval. Defendants were, therefore, fully aware that Sinclair's aggressive proposals would slow the FCC's review process and undermine the prospects for approval by subjecting the divestitures to intense regulatory scrutiny, particularly given that they involved stations in the first and third largest television markets in the United States.

78.     As Tribune expected, the FCC staff expressed frustration over what they viewed

as the unacceptably aggressive terms of Sinclair's proposed divestitures, making clear their position that Sinclair's relationships with the purchasers and the terms of the sales would enable Sinclair, effectively, to maintain operational control over the stations. That is, contrary to Tribune's prior assurances to the investing public, Sinclair did not actually "designate . . . certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)) [ ] as required by the FCC in order to obtain approval of and consummate the Merger." The FCC staff advised Sinclair to instead propose "clean" divestitures, i.e., arm's-length sales to truly independent third parties.

79. In addition to these "related-party sales," Sinclair proposed to the FCC the use of a contingent divestiture trust. Under the proposal Sinclair would place 23 stations in a contingent trust whereby, prior to consummation of the Merger, the trust would dispose of certain stations and transfer the others back to Sinclair. Such an arrangement would permit to Sinclair to delay the sale of any stations and, to the extent it did intend to sell, allow it time to determine the most financially beneficial group of stations to keep.

80. Significantly, Defendants did not disclose that Sinclair was delaying regulatory approval by refusing to propose to the FCC the station sales needed to satisfy the Duopoly Rule and National Cap until after it finished haggling with the DOJ over antitrust clearance, conduct that Tribune has testified caused Tribune's "breaching conduct" in rejecting the DOJ's November 17, 2017 offer to be a "double whammy."

81. Tribune also did not disclose to the investing public that Sinclair was undermining the prospects for approval of the Merger by proposing apparent sham transactions, that Sinclair's conduct was inconsistent with Tribune's prior statements regarding Sinclair's obligations, that

26

the FCC had expressed frustration, that the FCC viewed Sinclair's proposed divestitures as "unacceptably aggressive," that the FCC advised Sinclair to instead propose "clean divestitures," or that Sinclair ignored the advice of both Tribune and the FCC.

3. *Tribune Again Assures Investors That Sinclair is Using Best Efforts To Obtain Regulatory Approval, Including Committing to Required Station Divestitures*

82. In its Form 10-K for 2017, filed March 1, 2018, Tribune failed to disclose the facts indicating that Sinclair had put the Merger in grave jeopardy by refusing to make reasonable and previously-agreed efforts to obtain regulatory approval. Instead, Tribune stated that "[w]e currently anticipate the Merger will close in the second quarter of fiscal 2018" (*i.e.* one-to-four months from the date of that filing), and simply repeated its generic recitation of risk factors related to the Merger Agreement, stated previously in its November 29, 2017 registration statement, including the general possibility that regulatory approval would not be obtained.

83. Moreover, Tribune again assured the investing public that Sinclair had agreed to make station divestitures as required by government regulators to obtain regulatory approval.

84. Tribune stated therein:

> Sinclair also agreed, subject to the terms of the Merger Agreement, to use reasonable best efforts to take all actions to avoid or eliminate each and every impediment that may be asserted by any governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions (each, an "approval action") to obtain regulatory approval. Specifically, Sinclair agreed to divest one or more television stations in the following Nielsen DMAs: (i) Seattle-Tacoma, Washington, (ii) St. Louis, Missouri, (iii) Salt Lake City, Utah, (iv) Grand Rapids-Kalamazoo-Battle Creek, Michigan, (v) Oklahoma City, Oklahoma, (vi) Wilkes Barre-Scranton, Pennsylvania, (vii) Richmond-Petersburg, Virginia, (viii) Des Moines-Ames, Iowa, (ix) Harrisburg-Lancaster-Lebanon-York, Pennsylvania and (x) Greensboro-High Point Salem, North Carolina (collectively, the "overlap markets") as necessary to comply with the Duopoly Rule or to obtain clearance under the HSR Act, in each case as required by the applicable governmental

27

authority in order to obtain approval of and consummate the Merger, and if necessary or advisable to avoid, prevent, eliminate or remove the actual, anticipated or threatened commencement of any proceeding in any forum or issuance of any order that would delay, restrain, prevent, enjoin or otherwise prohibit consummation of the transactions contemplated by the Merger Agreement by any governmental authority.

Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each overlap market, as required by and subject to approval by the relevant governmental authority. Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)) (the "FCC National Cap") as required by the FCC in order to obtain approval of and consummate the Merger.

85. Tribune's statements in its March 1, 2018 Form 10-K were false and misleading, and omitted material facts necessary to make the statements not misleading, because Defendants knew no later than November 20, 2017: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures.

86. The March 1, 2018 10-K was further misleading because it stated that Tribune anticipated that the Merger would close in the second quarter of fiscal 2018 without disclosing that: (a) Sinclair had refused to make divestitures in the ten markets required for antitrust approval; (b) the FCC had advised Sinclair that its proposed divestiture structure was a non-starter and that its proposal to sell stations to related parties was problematic; (c) Sinclair had invited the DOJ to "sue me"; (d) Tribune executives understood that Sinclair's conduct had delayed the Merger and put its consummation at risk; (e) Tribune considered Sinclair's conduct a breach of the Merger Agreement; (f) Sinclair disagreed with Tribune regarding its obligation to

make reasonable best efforts to obtain regulatory approval; and (g) Tribune had twice threatened to sue Sinclair.

87.     Tribune stock closed at $42.06 per share on March 2, 2018, indicating that investors perceived a high degree of certainty that the Merger would close, as Tribune "anticipate[d]" in its March 1, 2018 Form 10-K.

    *4.     Tribune Continues to Withhold Sinclair's Dilatory Conduct from Investors*

88.     On March 6, 2018 Sinclair withdrew its February 20 proposal to the FCC to utilize a contingent divestiture trust.   However, it filed another application the same day proposing the same basic approach, but with five fewer stations in the trust.  On April 24, 2018, Sinclair withdrew its second divestiture trust proposal.

89.     On May 10, 2018, Tribune filed its Form 10-Q for the second quarter of 2018. Like Tribune's prior class period filings, the Form 10-Q provided detail concerning the purported progress of regulatory approval for the Merger.   The filing revealed that Sinclair and Tribune had modified previous applications:

> On April 24, 2018, the parties jointly filed (1) an amendment to the Applications [ ] that superseded all prior amendments and . . . provided additional information regarding station divestitures proposed to be made by Sinclair in 15 television markets in order to comply with the Duopoly Rule or the National Television Multiple Ownership Rule, (2) a letter withdrawing the Divestiture Trust Applications and (3) a letter withdrawing the application for approval of the sale of WPIX-TV to a third-party purchaser. In order to facilitate certain of the compliance divestitures described in the April 24 Amendment, between April 24, 2018 and April 30, 2018, Sinclair filed applications seeking FCC consent to the assignment of license or transfer of control of certain stations in 11 television markets.

90.     However, Tribune's May 10, 2018 Form 10-Q, like its prior filings, did not disclose: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; or (ii) that Sinclair was taking the position that it was not legally or contractually

required to make such divestitures. Moreover, it did not disclose either that the "modifications" were so extensive that Tribune and Sinclair were essentially starting from scratch, that Sinclair's prior behavior toward regulators had provoked the regulators' frustration and scrutiny (including numerous depositions), or that Tribune had twice threatened Sinclair with litigation to cause it to make reasonable concessions to regulators. Perhaps more significantly, the filing did not disclose that the current, modified proposals involved related-party transactions similar to the proposed transactions regulators had previously rejected.

91. As set forth above, the statements in Tribune's September 6, 2017 proxy statement, November 29, 2017 Prospectus, and March 1, 2018 Form 10-K, and May 10, 2018 Form 10-Q (¶¶ 56, 64, 81, 88) were false and misleading, and omitted material facts necessary to make the statement not misleading, because Defendants knew no later than November 20, 2017: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval, and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures.

## ADDITIONAL ALLEGATIONS OF SCIENTER

92. Defendants had actual knowledge: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures because: (a) they or their representatives were present at meetings with Sinclair and government regulators at which Sinclair representatives were combative, uncooperative and antagonistic to the regulators; (b) they were copied on or forwarded correspondence between government regulators and Sinclair in which Sinclair was combative, uncooperative and antagonistic to the regulators; and (c) they received correspondence from Sinclair expressly refusing to honor the obligations ascribed to

Sinclair in Tribune's public filings. Sinclair's breaching conduct on or about November 20, 2017 in refusing to accept the DOJ's offer to approve the Merger if Sinclair committed to divestitures was known to Tribune contemporaneously with the conduct as evidenced by Tribune's December 18, 2017 letter describing Sinclair's exchange with government regulators.

93.    Tribune was also aware of these developments because Sinclair was contractually required to keep Tribune informed of communications with government regulators about the Merger. Indeed, Section 7.1(h) of the Merger Agreement provides:

> Unless prohibited by applicable Law or Order or by the applicable Governmental Authority, each of the Company and [Sinclair] shall (i) to the extent reasonably practicable, not participate in or attend any meeting, or engage in any substantive conversation, with any Governmental Authority in respect of the Merger (including with respect to any of the actions referred to in Section 7.1(a) [regarding] regulatory approval]) without the other, (ii) to the extent reasonably practicable, give the other reasonable prior notice of any such meeting or conversation and (iii) in the event one such Party is prohibited by applicable Law or Order or by the applicable Governmental Authority from participating or attending any such meeting or engaging in any such conversation, keep the non-participating Party reasonably apprised with respect thereto.

94.    Defendants were motivated to conceal Sinclair's conduct and the fact that it jeopardized the Merger (*i.e.* disinclined to publicly admit that the Merger was in grave jeopardy) because the Merger Agreement was the culmination of an arduous and expensive process that was announced in early 2016, and the failure to consummate it was embarrassing to Tribune and the Individual Defendants. As Defendant Kern explained during an August 9, 2018 earnings call with investors after the Merger Agreement was terminated: "when a company spends 15 months trying to close a deal and doesn't, it's always hard on an enterprise and disappointing for a lot of people who invested their blood, sweat and tears in trying to do what they were asked to do, which is close the deal. . . . whenever you undertake an exercise like that, it's a disappointing not to finish."

95.     Furthermore, the Individual Defendants were publicly implicitly appointed to their positions for the purpose of selling the Company.  Defendants Bigelow and Lazarus were appointed CFO and CSO in February 2016, contemporaneously with the Board's decision to explore a sale of the company, and Defendant Kern was named interim CEO while Tribune was in confidential negotiations with Sinclair.  The revelation that the Individual Defendants may have failed in their primary assignment would embarrass them, and call into question their ability to lead the Company as well as Tribune's wisdom in appointing them to their positions.

96.     After the dissemination of the false and misleading statements described above, but before the undisclosed risk materialized and the truth emerged, Defendant Kern was elected on May 30, 2018 by shareholders to serve as a Class II director until 2021, and a resolution on executive compensation, including compensation to each of the Individual Defendants was approved by the shareholders, both on May 30, 2018.

## LOSS CAUSATION

97.     Defendants' misrepresentations and omissions of material fact alleged above artificially inflated the price of Tribune stock during the Class Period.

98.     The artificial inflation created by Defendants' alleged misrepresentations and omissions was removed from the prices of Tribune's common stock in direct response to information revealed in the disclosures alleged above, through which facts that partially corrected Defendants' prior misrepresentations and omissions of material fact were revealed and/or the risks concealed by such misrepresented and omitted material facts partially materialized.

99.     On July 16, 2018, FCC Chairman Ajit Pai issued a statement expressing "serious concerns about the Sinclair/Tribune transaction," in particular that "certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice,

even if not in name, in violation of the law."

100.    Later on July 16, Bloomberg, Reuters and others in the media reported – and counsel for Tribune and Sinclair independently confirmed with FCC staff – that Chairman Pai had circulated to the other Commissioners a draft order asserting that Sinclair appeared to have engaged in misconduct relating to the Fader and Cunningham divestiture applications and that a majority of the Commissioners had already voted to refer the applications to an administrative law judge for review.

101.    As media outlets correctly reported and as analysts correctly explained, the FCC's statement, any chance of receiving regulatory approval before the August 8, 2018 deadline was dead.

102.    The FCC's eleventh-hour determination to refer Sinclair's proposed station divestitures to an administrative law judge, and the attendant failure of the Merger to obtain approval before the deadline, was the materialization of a previously undisclosed risk that Sinclair's obstruction and inflexibility in its discussions with regulators would prevent the Merger from obtaining regulatory approval.  Tribune has admitted in its verified complaint in the Contract Litigation that Sinclair's conduct before, and communications with, the DOJ delayed the FCC's review, and ultimately contributed to the failure of the Merger.

103.    Tribune stock closed at $32.12 per share on July 16, 2018, down more than sixteen percent from $38.56 at close on the previous trading day and down more than twenty-three percent from its closing price on the day after Tribune's false and misleading March 1, 2018 Form 10-K ($42.06 per share).

104.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and other Class members.  Had Defendants disclosed complete,

accurate, and truthful information concerning these matters during the Class Period, Plaintiff and other Class members would not have purchased or otherwise acquired Tribune stock, or would not have purchased or otherwise acquired stock at the artificially inflated prices that they paid. It was also entirely foreseeable to Defendants that misrepresenting and concealing these material facts would artificially inflate the price of Tribune stock and that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Tribune stock to decline.

105.    The economic loss, *i.e.* damages, suffered by Plaintiff and other Class members directly resulted from Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's securities when the truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized. As a result of the previously misrepresented and concealed material information and risks that were disclosed on July 16, 2018, and the corresponding substantial decline in the price of Tribune stock as the market absorbed this information, Plaintiff and other Class members have suffered economic loss.

## **CLASS ACTION ALLEGATIONS**

106.    This class action is brought on behalf of all individuals and entities, except Defendants and their affiliates who purchased shares of Tribune stock during the November 29, 2017 through July 16, 2018 Class Period.

107.    The Class is so numerous that joinder of all members is impracticable. As of the close of business on August 8, 2018, approximately 87.6 million shares of Tribune common stock were outstanding. Those shares were held by hundreds, if not thousands, of individuals and entities located throughout the country.

108.    Questions of law and fact are common to the Class, including, among others, (i)

whether Defendants violated the Exchange Act; and (ii) whether and to what extent Defendants'
conduct harmed Plaintiff and other members of the Class.

109.    There is a well-defined community of interests in the questions of law and fact
involved in this case. Questions of law and fact common to the members of the Class which
predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order
to make the statements made, in light of the circumstances under which they were made, not
misleading;

(d)    Whether Defendants disregarded that their statements and/or omissions
were false and misleading;

(e)    Whether Defendants' conduct caused the members of the Class to sustain
damages; and

(f)    The extent of damage sustained by Class members and the appropriate
measure of damages.

110.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class
sustained damages from Defendants' wrongful conduct.

111.    Plaintiff will adequately protect the interests of the Class and has retained counsel
experienced in class action securities litigation. Plaintiff has no interests which conflict with
those of the Class.

112.    A class action is superior to other available methods for the fair and efficient
adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

113.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Tribune who knew that the statement was false when made.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

114.    At all relevant times, the market for Tribune's common stock was efficient for the following reasons, among others:

(a)    Tribune stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient and automated market;

(b)    As a regulated issuer, Tribune filed periodic reports with the SEC and the NYSE;

(c)    Tribune regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Tribune was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

115.    As a result of the foregoing, the market for Tribune's common stock reasonably promptly digested current information regarding Tribune from all publicly available sources and reflected such information in the price of Tribune's common stock.  All purchasers of Tribune common stock during the Class Period suffered similar injury through their purchase of Tribune common stock at artificially inflated prices, and a presumption of reliance applies.

116.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## COUNT  I

### On Behalf of Plaintiff and the Class Against All Defendants for
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

117.    Plaintiff repeats and reallege each and every allegation contained above (other than disclaimers of fraud claims) as if fully set forth herein.

118.    During the Class Period, Tribune and the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Tribune securities at artificially inflated prices.

119.    Tribune and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material

facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Tribune's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

120.     Tribune and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Sinclair's unwillingness to make the station divestitures required to obtain regulatory approval for the Merger and the prospect that the Merger would therefore not be consummated.

121.     During the Class Period, Tribune and the Individual Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

122.     Tribune and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Tribune and the Individual Defendants engaged in this misconduct to conceal: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures and to support the artificially inflated prices of the Company's securities.

123.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tribune's securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Tribune's securities had been artificially inflated by Tribune's and the Individual Defendants' fraudulent course of conduct.

124.     As a direct and proximate result of Tribune's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered economic loss and damages in connection with their respective purchases of the Company's securities during the Class Period as the prior artificial inflation in the price of Tribune's securities was removed over time.

125.     By virtue of the foregoing, Tribune and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of
Section 20(a) of the Exchange Act**

126.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

127.     The Individual Defendants acted as controlling persons of Tribune within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the materially false and misleading public statements about Tribune during the Class Period, the Individual Defendants had the power and ability to control the actions of Tribune and its employees.  By reason of such conduct, the Executive

Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Declaring that all Defendants violated Section 10(b) of the Exchange Act as well as Rule 10b-5 promulgated thereunder, and that the Individual Defendants violated Section 20(a) of the Exchange Act;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

DATED: September 10, 2018                    Respectfully Submitted,

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle
**ENTWISTLE & CAPPUCCI LLP**
299 Park Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
aentwistle@entwistle-law.com

Michael H. Moirano
Claire G. Kenny
Stephen A. Gorman
**MOIRANO GORMAN KENNY, LLC**
135 S. LaSalle St., Suite 2200
Chicago, Illinois 60603
Telephone: (312) 614-1260
mmoirano@mgklaw.com

*Counsel for Plaintiff The Arbitrage Event-Driven Fund*

41