**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THE ARBITRAGE EVENT-DRIVEN FUND, *et al.*, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>TRIBUNE MEDIA COMPANY, PETER M. KERN, CHANDLER BIGELOW, CRAIG A. JACOBSON, ROSS LEVINSOHN, PETER E. MURPHY, LAURA R. WALKER, OAKTREE TRIBUNE, L.P., OAKTREE CAPITAL MANAGEMENT, L.P., and MORGAN STANLEY & CO. LLC,<br><br>               Defendants. | No. 18-cv-06175 (CPK)<br><br>Hon. Charles P. Kocoras<br><br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................................ 2

    A.  Overview of the Merger.................................................................................... 7

    B.  Overview of the Tribune Defendants' Misstatements and
        Omissions........................................................................................................ 10

    C.  Overview of the Harm to Tribune's Non-Insider Investors................................ 17

II.  JURISDICTION AND VENUE ..................................................................................... 18

III.  PARTIES ..................................................................................................................... 19

    A.  Plaintiffs ............................................................................................................ 19

    B.  The Tribune Defendants .................................................................................. 20

    C.  The Oaktree Defendants ................................................................................. 21

    D.  The Director Defendants.................................................................................. 22

    E.  Defendant Morgan Stanley ............................................................................. 23

IV.  SUBSTANTIVE ALLEGATIONS ................................................................................ 23

    A.  Background of Tribune..................................................................................... 23

    B.  The Oaktree Defendants' Continued Interest in Tribune.................................... 25

    C.  Tribune's Management Positions the Company for Sale and
        Executes a Definitive Merger Agreement with Sinclair ...................................... 26

    D.  The Tribune Defendants' Pre-Class-Period Statements Regarding
        Sinclair's Purported Agreement to Sell Stations as Necessary to
        Obtain Regulatory Approval............................................................................. 28

    E.  The Tribune Defendants and the Oaktree Defendants Learn that
        Sinclair Is Refusing to Make the Previously-Agreed-To
        Divestitures, but the Tribune Defendants Continue to Assure
        Investors that Sinclair Intends to Do So .......................................................... 32

    F.  The Tribune Defendants' Class-Period Misrepresentations and
        Omissions of Material Fact Regarding Sinclair's Refusal to Divest
        Stations as Necessary to Obtain Regulatory Approval ...................................... 34

        1.  *Tribune Learns that Sinclair is Proposing a Divestiture*
            *Process that the FCC has Never Approved, And Related-*
            *Party Sham Transactions that the FCC Would Never*
            *Approve, Further Jeopardizing the Merger* .............................................. 38

-i-

        2.      *Tribune Continues to Assure Investors That Sinclair is Using Best Efforts to Obtain Regulatory Approval, Including Making the Required Station Divestitures* ............................... 40

        3.      *Tribune Never Voluntarily Discloses Sinclair's Intransigent Conduct to Investors* ..................... 42

    G.    The Truth Is Revealed by the FCC Chairman ..................... 44

V.       ADDITIONAL ALLEGATIONS OF SCIENTER ........................... 46

VI.      LOSS CAUSATION ........................................................... 49

VII.     CLASS ACTION ALLEGATIONS ....................................... 51

VIII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................... 52

IX.      APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........................................ 53

X.       CAUSES OF ACTION ....................................................... 54

COUNT I:  Against the Tribune Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ................... 54

COUNT II:  Against Oaktree for Violations of Section 20A of the Exchange Act .................... 56

        1.      *The Oaktree Defendants Possessed Material Non-Public Information About Sinclair's Breaching Conduct Related to the Merger at the Time of the Oaktree Offering* ....................... 56

        2.      *Oaktree Sold Tribune Stock in the Oaktree Offering* ............................ 58

        3.      *Plaintiffs Purchased Tribune Stock Contemporaneously with Oaktree's Sales* ....................... 59

        4.      *Oaktree is Liable to Each Class Member Who Purchased Contemporaneously with Its Sales* ....................... 59

COUNT III:  Against Oaktree Capital for Violations of Section 20(a) of the Exchange Act ................................................................ 60

COUNT IV:  Against the Tribune Defendants, the Director Defendants and Morgan Stanley For Violations of Section 11 of the Securities Act ................... 61

COUNT V:  Against Morgan Stanley for Violations of Section 12(a)(2) of the Securities Act ................................................................ 63

XI.      PRAYER FOR RELIEF ..................................................... 65

XII.     JURY DEMAND ............................................................. 66

Court-appointed lead plaintiffs The Arbitrage Event-Driven Fund, The Arbitrage Fund and the Water Island Merger Arbitrage Institutional Commingled Master Fund, LP (collectively, the "Water Island Funds" or "Lead Plaintiffs"), along with additional plaintiffs the FNY Partners Fund LP and FNY Managed Accounts, LLC (collectively, the "First New York Funds," or the "First New York Plaintiffs" and together with the Water Island Funds, the "Plaintiffs"), bring this action (the "Action") pursuant to Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") on behalf of themselves and all other persons or entities (the "Class") who purchased or otherwise acquired common stock of Tribune Media Company ("Tribune" or the "Company"):

(a)     During the period from November 29, 2017 through July 15, 2018, inclusive (the "Class Period");

(b)     Contemporaneously with sales by defendant Oaktree Tribune, L.P. ("Oaktree") in its November 29, 2017 secondary offering of Tribune common stock (the "Oaktree Offering"), underwritten by Defendant Morgan Stanley & Co, LLC ("Morgan Stanley"); and/or

(c)     Pursuant or traceable to the Oaktree Offering

Plaintiffs' allegations herein are upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters based on the ongoing investigation by undersigned counsel, including review and analysis of: (i) Tribune's public filings with the Securities and Exchange Commission (the "SEC"); (ii) Tribune's complaint and other filings in *Tribune Media Company v. Sinclair Broadcast Group, Inc.,* C.A. No. 2018-0593-JTL (Del. Ch.) (the "Delaware Merger Litigation"); (iii) media reports concerning Tribune and other facts related to this Action; and (iv) data concerning the price of Tribune common stock. Plaintiffs believe that substantial additional evidentiary support for the allegations herein will be uncovered following a reasonable opportunity to conduct discovery.

I.     **INTRODUCTION**

1.      On July 16, 2018, Federal Communications Commission ("FCC") Chairman Ajit Pai issued a statement expressing "serious concerns" about a well-publicized prospective merger announced in May 2017 and pending for more than a year (the "Merger") between Tribune and Sinclair Broadcasting Group, Inc. ("Sinclair").  In particular, Chairman Pai stated that "certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law."

2.      Put another way, Chairman Pai revealed for the first time in the eight months Tribune had been touting the Merger that Sinclair had, in fact, repeatedly proposed to the FCC a sham structure – which Tribune later revealed had been repeatedly rejected by the FCC – under which Sinclair would still control stations that it was otherwise required to divest in order to comply with FCC regulations to complete the Merger.  This news that Sinclair was not agreeing to divest stations as required by federal regulations – which was directly contrary to Tribune's public statements since May 2017 that Sinclair had agreed to do so and was undertaking the regulatory steps necessary to complete the Merger – caused the price of Tribune's common stock to fall significantly.  By the close of trading on July 16, 2018, Tribune's stock price had fallen 16%, or $6.44 per share, wiping out more than $564 million in market capitalization.  Ultimately, as Chairman Pai's statement indicated, Sinclair's refusal to make station divestitures as required by federal regulations caused the Merger to fail.

3.      The substantial decrease in Tribune's share price following the July 16, 2018 announcement demonstrated the materiality of the Merger to shareholders, particularly given that Tribune had announced to shareholders that it was seeking a merger more than a year prior to its agreement with Sinclair and the market had reacted favorably.  Indeed, Tribune first announced in

February 2016 that its board of directors (the "Board") was seeking "strategic alternatives" for the Company (including a merger) to "maximize shareholder value," and mere *rumors* of the Merger with Sinclair a year later in March 2017 caused investors to drive Tribune's share price up nearly 6% in a single day.

4.     Unfortunately, because Tribune and its Chief Executive and Chief Financial Officers (the "Tribune Defendants") had been pursuing a merger since early 2016, and investors reacted so positively to the Merger, when it privately became clear to Tribune that Sinclair was refusing to comply with its regulatory commitments, the Tribune Defendants were motivated to conceal that Sinclair's conduct placed the Merger materially in doubt.

5.     Significantly, the Tribune Defendants have admitted that they were aware that Sinclair was refusing to undertake the station divestitures necessary for approval of the Merger for more than *eight months* before Chairman Pai first alerted the public.  Tribune's own pleading in the Company's subsequent Delaware Merger Litigation against Sinclair for breach of the Merger Agreement (as defined below) reveals that "from virtually the moment the Merger Agreement" was signed, Sinclair was "confrontational and belittling" toward the staff of the United States Department of Justice ("DOJ") throughout the DOJ antitrust review process that had begun by August 2017, and that by early October 2017, the DOJ "reaffirmed that it was continuing to investigate" whether Sinclair's proposal to not divest stations in most of the agreed markets would violate antitrust regulations.

6.     That same pleading reveals that, no later than November 20, 2017, the Tribune Defendants unquestionably knew that Sinclair was flatly refusing to comply with a DOJ demand to divest stations in the agreed markets and that, consequently, the DOJ was escalating its investigation to include depositions of Tribune and Sinclair personnel.

7.    Moreover, as set forth herein, Tribune's largest shareholder, Defendant Oaktree, also knew that Sinclair was refusing to divest stations in contrast to Tribune's repeated public statements that it had agreed to do so.  Indeed, the DOJ was investigating Sinclair's conduct in early October 2017, before the Co-Chairman and Chief Investment Officer of Oaktree's ultimate parent, Bruce Karsh, resigned as Chairman of Tribune's Board (a position he had held since 2013) in anticipation of the Merger and was not replaced.

8.    Not coincidentally, while in possession of this non-public information, on November 29, 2017 (the first day of the Class Period), Defendant Oaktree initiated the Oaktree Offering of seven million shares of Tribune common stock (almost half its total Tribune holdings) underwritten by Defendant Morgan Stanley.  The Oaktree Offering was made pursuant to a November 29, 2017 prospectus stating, among other things, that "Sinclair agreed to divest one or more television stations" in ten "overlap markets" as necessary to gain regulatory approval and omitting the fact that Sinclair's refusal to do so had already prompted an investigation by regulators, including litigation-style depositions.  Notably, at the price Oaktree sold, its shares netted $21.98 million less than the consideration it would have received a few months later, if it had not sold the shares, and the anticipated Merger had closed.  But, unlike other market participants, Oaktree knew that that prospective Merger was in serious doubt due to Sinclair's refusal to proceed with station divestitures, and thus it was able to unload seven million shares at artificially inflated prices.  By selling on inside knowledge, Oaktree avoided a loss of more than $42 million on its seven million shares – *all of the shares it could sell pursuant to the prospectus supplement* – that it would have sustained had it waited to sell until after the July 16, 2018 announcement that the Merger was imperiled.

9.      Plaintiffs bring this Action on behalf of public investors in Tribune common stock who suffered hundreds of millions of dollars in losses from Class Period purchases when the market learned that the Merger would fail, an outcome that the Tribune Defendants and Oaktree Defendants knew was a distinct possibility no later than November 20, 2017.

10.      *First*, this Action asserts a claim pursuant to Section 10(b) of the Exchange Act (Count I) on behalf of persons or entities who purchased Tribune common stock during the Class Period while the Tribune Defendants were making, or causing to be made, misrepresentations and omissions of material fact in the Company's public filings concerning Sinclair's compliance with the regulatory approval process necessary to complete the Merger.  Specifically, during the Class Period, when the Tribune Defendants frequently discussed the regulatory steps necessary to complete the Merger in public statements and presentations, they misstated or omitted the following facts concerning Sinclair's publicly-reported (purported) agreement to divest certain television stations in markets necessary to satisfy FCC regulations:

> (a)      Sinclair was, in fact, refusing to divest itself of television stations in certain markets that it had previously purportedly agreed to sell to secure regulatory approval for the Merger; and
>
> (b)      In direct contradiction to Tribune's public statements, the Company knew that Sinclair was, in fact, taking the position that it was not legally or contractually obligated to complete the identified divestitures to ensure regulatory approval.

Accordingly, the Tribune Defendants are liable to Class Period purchasers under Section 10(b) of the Exchange Act.

11.      *Second*, this Action asserts a claim pursuant to Section 20A of the Exchange Act (Count II) on behalf of persons or entities who purchased Tribune common stock contemporaneously with Defendant Oaktree's sales in the November 29, 2017 Oaktree Offering. Oaktree made these sales while in possession of material nonpublic information concerning

Sinclair's refusal to divest television stations in markets necessary to satisfy regulators and complete the Merger. Accordingly, Oaktree is liable to such contemporaneous purchasers under Section 20A of the Exchange Act.

12.     *Third,* this Action asserts a claim pursuant to Section 20(a) of the Exchange Act (Count III) against Oaktree Capital Management, L.P. ("Oaktree Capital," and together with Oaktree, the "Oaktree Defendants"). Defendant Oaktree Capital is the ultimate owner and controlling entity of Oaktree, whose co-founders (including Mr. Karsh) and senior partners comprised the investment committee responsible for the disposition of Defendant Oaktree's Tribune shares. Because Defendant Oaktree Capital caused Oaktree to sell Tribune stock while in possession of material non-public information, it is liable to contemporaneous purchasers in the Oaktree Offering under Section 20(a) of the Exchange Act.

13.     *Fourth*, this Action asserts a claim pursuant to Section 11 of the Securities Act (Count IV) on behalf of persons or entities who purchased Tribune common stock pursuant or traceable to the Oaktree Offering. The Tribune Defendants, members of Tribune's Board (the "Director Defendants"), and Defendant Morgan Stanley issued or caused to be issued a registration statement and prospectus for the Oaktree Offering which contained untrue statements or omissions of material fact concerning Sinclair's refusal to divest television stations in markets necessary to satisfy FCC regulations and complete the Merger. Accordingly, these Defendants are liable to purchasers in or traceable to the Oaktree Offering under Section 11 of the Securities Act.

14.     *Fifth*, this Action asserts a claim pursuant to Section 12(a)(2) of the Securities Act (Count V) on behalf of persons or entities who purchased Tribune common stock in the Oaktree Offering from Defendant Morgan Stanley, which sold Tribune common stock pursuant to a prospectus which included untrue statements of a material fact and omitted material facts necessary

in order to make the statements, in the light of the circumstances under which they were made, not misleading, concerning Sinclair's refusal to divest television stations in markets necessary to satisfy FCC regulations and complete the Merger. Accordingly, Morgan Stanley is liable to purchasers in the Oaktree Offering under Sections 11 and 12(a)(2) of the Securities Act.

### A. Overview of the Merger

15. When Tribune emerged from bankruptcy on New Year's Eve in 2012, Defendant Oaktree became the Company's largest stockholder. Within a month, Mr. Karsh was named Chairman of Tribune's Board. While Mr. Karsh served as the Chairman, he also served as Oaktree Capital's Co-Chairman and Chief Investment Officer, and as a member of Oaktree Capital's investment committee, which was charged with all decisions related to the disposition of Oaktree's Tribune stock.

16. In early 2016, the Board, led by Mr. Karsh, decided that Tribune should initiate a review of strategic options to maximize shareholder value, *i.e.*, was considering a sale of the Company. Specifically, on February 29, 2016, Tribune announced that the "Board of Directors and the Company have initiated a process to explore the full range of strategic and financial alternatives to enhance shareholder value." These alternatives included seeking a merger or sale of the Company. Investors reacted positively to this announcement. Tribune's share price rose 9%, closing at $35.90 per share that day, up from $32.95 at close on the previous trading day (February 26). Tribune's share price rose again the next day, closing at $37.91 on March 1, 2016, up more than 15% from its close on the day before the announcement.

17. Tribune and its Board did indeed explore opportunities to sell the Company throughout the remainder of 2016. In particular, negotiations regarding a possible acquisition by Sinclair began in earnest by November 2016.

18. On March 1, 2017, Reuters reported rumors that Sinclair executives had approached Tribune about a possible acquisition, causing the price of Tribune's common stock to close at $38.75 per share, up 5.8%. On May 8, 2017, following approximately six months of confidential negotiations, Sinclair and Tribune announced an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which each share of Tribune stock would be converted into the right to receive $35 in cash plus 0.23 shares of Sinclair Class A common stock, for a total value of $43.50 per share. Following this announcement, the price of Tribune's common stock rose another 5.2%, to close at $42.40 per share.

19. The Merger made practical sense and would achieve certain synergies. Sinclair owns more television stations than any company in the United States – approximately 193 stations in 80 markets, while Tribune owns 42 stations in 33 markets. However, these synergies also presented a challenge. Because of the FCC's rules concerning multiple-ownership of stations in the same market (the "Duopoly Rule"), Sinclair's ability to gain regulatory approval to acquire Tribune's stations immediately became a topic of concern to the market.

20. Indeed, Tribune and Sinclair knew that a combination of the two companies would trigger regulatory scrutiny by both the DOJ and the FCC. Accordingly, the Merger Agreement required Sinclair to use its "best efforts" to gain regulatory approval of the Merger, including but not limited to "Station Divestitures" in certain markets to comply with FCC regulations.

21. In this regard, Tribune's May 8, 2017 press release announcing the Merger assured the market that, while the Merger was contingent upon "approval by the Federal Communications Commission [ ], and antitrust clearance," in "order to comply with FCC ownership requirements and antitrust regulations, Sinclair may sell certain stations in markets where it currently owns stations."

-8-

22.     In fact, the next day, May 9, 2017, Tribune filed a Form 8-K with the SEC that went further, representing that Sinclair *was willing and had agreed to divest stations*. Specifically, Tribune attached the Merger Agreement to its Form 8-K, and explicitly incorporated it therein by reference. When referring to station divestitures, the Merger Agreement expressly stated that Sinclair was willing "to sell, lease, license or otherwise dispose of . . . and promptly to effect the sale, lease, license, disposal and holding separate of, such assets, rights, product lines, categories of assets or businesses or other operations or interests therein" to gain regulatory approval. The Merger Agreement referred to Sinclair's commitment as the "Station Divestitures".

23.     The market reacted favorably. In total, on May 8, 2017, the closing price of Tribune stock was up 15.9% from its closing price on February 28, 2017, the day before speculation about the possible deal with Sinclair was first reported in the media.

24.     Unfortunately, unbeknownst to Tribune's shareholders, Sinclair did not intend to proceed with the required station divestitures – even in the markets where it had confidentially agreed with Tribune that it would sell them – regardless of whether government regulators determined that those sales were necessary to comply with FCC ownership requirements and antitrust regulations. Rather, Sinclair intended to take the position that it was permitted, under the Merger Agreement, to contest the conclusions of government regulators even to the point of litigation against the government. Sinclair's planned obstinance presented a significant risk that the Merger would be substantially delayed, or that it would not be consummated at all.

25.     Nevertheless, recognizing that regulatory approval was critical to the proposed Merger and that it was something to which the market was attuned, Tribune again assured investors in its September 6, 2017 proxy solicitation (the "September 2017 Proxy") requesting shareholder approval of the Merger Agreement that "Sinclair also agreed, subject to the terms of the agreement,

to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions, each referred to as an 'approval action,' to obtain regulatory approval." Tribune further disclosed the ten specific markets in which Sinclair had putatively agreed to make station divestitures to obtain regulatory approval – divestitures which the DOJ staff later deemed sufficient to obtain antitrust clearance had Sinclair proceeded with their agreement to do so.

26. The representations in the September 2017 Proxy were later incorporated by reference in the Registration Statement and Prospectus (as defined below) for the Oaktree Offering issued on the first day of the Class Period, which included similar representations.

**B.    Overview of the Tribune Defendants' Misstatements and Omissions**

27. However, contrary to the Tribune Defendants' public assurances and the Offering Materials (as defined below), Tribune and Oaktree learned virtually immediately that Sinclair did not intend to comply with its obligations. According to Tribune's complaint in the Delaware Merger Litigation, "[f]rom the start of DOJ's review of the Merger, DOJ staff made clear that they had serious concerns about Sinclair retaining both its and Tribune's stations in the ten Overlap [markets]" and that "from virtually the moment the Merger Agreement was signed . . . Sinclair engaged in belligerent and unnecessarily protracted negotiations with DOJ and the FCC over regulatory requirements" and "refused to sell stations in the ten specified markets required to obtain approval."

28. Indeed, by August 2017 the DOJ had repeatedly rejected Sinclair's requests that the DOJ remove most of the ten overlap markets from its review, and, by early October 2017 the "DOJ reaffirmed that it was investigating all of them."

29.     Crucially, by no later than November 20, 2017, the Tribune Defendants and Oaktree knew that Sinclair was flatly refusing to comply with a DOJ demand to divest stations in the agreed markets.  On November 17, 2017, the DOJ again rejected Sinclair's repeated assertions that it was not required to divest stations and informed both Sinclair and Tribune of its position that divestitures would be required in eight-to-ten of the agreed markets.  Three days later, on November 20, 2017, the DOJ rejected a request from Sinclair to pause the DOJ's investigation into the Merger unless Sinclair put station divestitures on the table, and the DOJ refused to postpone depositions designed to support a DOJ complaint, which were scheduled to begin that week. Instead, the DOJ commenced litigation-style depositions of Sinclair and Tribune personnel immediately following Sinclair's November 20, 2017 refusal to consider divesting stations in the agreed markets.

30.     The Tribune Defendants were aware of these developments because (i) Sinclair was contractually required to keep Tribune apprised of its conversations with government regulators regarding the Merger and did keep Tribune so apprised; (ii) Tribune was at all times participating in the regulatory approval process; and (iii) government regulators communicated directly with Tribune regarding their communications with Sinclair.

31.     As demonstrated by Tribune's description of Sinclair's conduct toward regulators (recounted in a private December 18, 2017 letter), Tribune believed that Sinclair's conduct was inconsistent with its obligations under the Merger Agreement.  Accordingly, the Tribune Defendants knew by no later than November 29, 2017 – if they did not already know before then – that completion of the Merger was in serious doubt.

32.     Put another way, Tribune unquestionably knew by the beginning of the Class Period on November 29, 2017: (i) that Sinclair was not making the station divestitures required to obtain

regulatory approval, in direct violation of the Merger Agreement; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures, a position that the DOJ had already repeatedly rejected.

33. Similarly, based on its extensive relationship with Tribune, Defendant Oaktree likewise knew by the beginning of the Class Period that Sinclair was not making the station divestitures as regulatorily and contractually required and that Sinclair was taking a position on the divestitures already rejected by the DOJ.

34. Even though these Defendants knew, by early October 2017 and certainly no later than November 20, 2017, material facts contrary to Tribune's statements in its May 8 press release and its September 2017 Proxy concerning Sinclair's willingness to make station divestitures as required to obtain regulatory approval, the Tribune Defendants failed to correct those statements or reveal the newly-learned facts. Rather, the Tribune Defendants repeated their previous misstatements.

35. On November 29, 2017, Tribune filed a (i) Form S-3 registration statement and prospectus (the "Registration Statement and Prospectus") for the 14,145,447 shares of Tribune common stock owned by Oaktree; and (ii) Form 424(b)(3) preliminary prospectus supplement (the "Preliminary Prospectus Supplement") for Oaktree's secondary offering of more than seven million shares of Tribune common stock. Shortly thereafter, Tribune filed a final prospectus supplement on Form 424(b)(3) for the Oaktree Offering (the "Prospectus Supplement," together with the Registration Statement and Prospectus and Preliminary Prospectus Supplement, the "November 2017 Offering Materials" or "Offering Materials").

36. The November 2017 Offering Materials repeated Tribune's prior statements concerning Sinclair's purported agreement to divest stations in certain markets to achieve

regulatory approval – statements the Tribune Defendants knew by then were false, misleading and/or incomplete – and indeed even specifically identified the markets. For example, the Offering Materials stated that "Sinclair . . . agreed, subject to the terms of the Merger Agreement, to use its reasonable best efforts, to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable law to complete the Merger" and "to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions [ ] to obtain regulatory approval." *At the time these statements were made, the Tribune Defendants and Defendant Oaktree already knew that Sinclair was not complying with its obligations.*

37.     Sinclair's obstinacy in its dealings with government regulators became more apparent and alarming to Tribune over the next several weeks. Sinclair rejected a December 13, 2017 DOJ offer to pause its investigation if Sinclair would put station divestitures in seven of the agreed-to markets "on the table." Sinclair likewise rejected a December 15, 2017 offer by the DOJ to end the investigation and provide "immediate clearance" for the Merger to proceed if Sinclair would divest stations in the ten markets listed in Tribune's September 2017 Proxy and November 2017 Offering Materials.

38.     Alarmed, by December 18, 2017, Edward Lazarus, Tribune's General Counsel and Chief Strategy Officer, wrote to Sinclair's General Counsel expressing Tribune's "serious concern with Sinclair's approach to obtaining the Department of Justice's clearance." Mr. Lazarus stated that the Merger Agreement required Sinclair to accept the DOJ's offer, a position consistent with Tribune's previous public statements about the Merger Agreement. Sinclair's General Counsel refused to comply in a letter dated the same day, and further stated in a December 21 email to Mr.

-13-

Lazarus that "we disagree . . . with your legal conclusions." Sinclair then sent an aggressive and insulting letter to the DOJ, refusing to offer divestitures and inviting litigation. Defendant Kern was copied on Mr. Lazarus's December 18, 2017 letter, as were Tribune's outside lawyers.

39. Despite these developments, Tribune made no effort to inform shareholders that the statements in its May 8, 2017 press release, its September 2017 Proxy and its November 2017 Offering Materials were false, misleading, and/or incomplete. At the very least, Tribune had an obligation to inform its shareholders: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval, in direct violation of the Merger Agreement; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures, a position that the DOJ had already repeatedly rejected. Tribune also failed to advise its shareholders that Sinclair and Tribune explicitly disagreed about the contours of Sinclair's obligations to take steps necessary to complete the Merger.

40. Throughout January and February of 2018, Sinclair's posture toward government regulators became even more confrontational, and its exchanges with Tribune even more adversarial. Sinclair repeatedly refused the DOJ's offers to end its investigation if Sinclair would commit to divestitures in the ten markets listed in Tribune's SEC filings, and similarly refused alternative offers that would have halted the investigation while Sinclair and regulators discussed specifics in good faith. Further alarming Tribune, but undisclosed to the public, Sinclair repeatedly disclaimed that it had a contractual obligation to Tribune to commit to the divestitures, expressly informing Tribune that it disagreed with Tribune's "legal conclusions" in that regard.

41. Shortly before the January 25, 2018 "closing meeting" among the DOJ staff, Sinclair, and Tribune, at which time the government typically decides whether to grant antitrust clearance or pursue litigation, Tribune reminded Sinclair that Sinclair was obligated to accept the

DOJ's offer to grant clearance in return for Sinclair's commitment to make divestitures in the ten agreed-to markets. Sinclair responded that it had no such obligations, and, when the DOJ repeated the offer, Sinclair's General Counsel rejected the offer and told the DOJ staff: "sue me."

42. Plainly, Tribune knew that Sinclair's conduct put the Merger in serious jeopardy, and that Sinclair intended to further jeopardize the Merger through continued obstinance and antagonism in response to government regulators. Yet Tribune still did not inform its shareholders: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval, in direct violation of the Merger Agreement; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures, a position that the DOJ had already repeatedly rejected. Even as Tribune twice threatened to sue Sinclair if Sinclair did not comply with its obligations (on February 9 and 14), Tribune did not disclose the circumstances that necessitated those threats, much less the fact that litigation was imminent.

43. Meanwhile, the FCC – whose approval was also required to consummate the Merger – informed Sinclair and Tribune that Sinclair's proposed approach to making the divestitures required to satisfy the Duopoly Rule through a contingent divestiture trust was unlikely to be approved. Sinclair responded by submitting an amended but similar application on February 20, 2018, which also proposed the use of a contingent divestiture trust. The FCC rejected this proposal a mere two weeks later in a decision that Tribune has since publicly characterized as "unsurprising."

44. In addition, Sinclair was required to propose to the FCC specific station sales to satisfy the rule that prevents entities from owning or controlling television stations that, together, have an aggregate "national audience reach" that exceeds 39 percent of U.S. television households (the "National Cap"). Because the National Cap limits the total number of television stations one

company can own by applying a simple numeric restriction on the percentage of television households it can reach, Sinclair could have met the cap through myriad different combinations of station divestitures. These divestiture combinations could easily have been commercially reasonable, provoked little public opposition, and been quickly approved by the FCC.

45.     Instead, Sinclair waited until late February 2018 to even begin the process of preparing such sales, and when it did so, it included sales both (i) to parties that had significant ties to Sinclair's Executive Chairman, David Smith, and his family; and (ii) subject to arrangements in which Sinclair would effectively operate the divested stations. Tribune warned Sinclair that its proposal of such transactions made FCC approval less likely and was incompatible with Sinclair's obligations under the Merger Agreement. Tribune therefore requested that Sinclair propose "clean" transactions instead.

46.     Despite Tribune's growing, privately-expressed alarm, and despite further statements and actions by Sinclair demonstrating that regulatory approval for the Merger was materially at risk, Tribune still did not disclose: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval, in direct violation of the Merger Agreement; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures, a position that the DOJ and FCC had already rejected.

47.     Remarkably, Tribune not only failed to correct its May 8, September 6, and November 29, 2017 statements, it largely *repeated* them and made further false and misleading statements about the Merger Agreement and Sinclair's efforts to obtain regulatory approval in its Form 10-K for 2017, publicly filed with the SEC on March 1, 2018. Tribune further stated in that filing: "We currently anticipate the Merger will close in the second quarter of fiscal 2018."

48. In other words, rather than disclose the facts it knew about Sinclair's conduct, Tribune assured the investing public *again* that, pursuant to the confidential disclosure memorandum, Sinclair had agreed to sell stations as required to obtain regulatory approval and that the process was proceeding apace.

### C. Overview of the Harm to Tribune's Non-Insider Investors

49. The Tribune Defendants' material misstatements and omissions concealed from the market facts unquestionably known by Tribune that presented a substantial risk that the Merger would not obtain regulatory approval and would fail. Plaintiffs and other investors therefore purchased shares of Tribune stock at inflated prices during the Class Period. But for the Tribune Defendants' misstatements and omissions, investors would not have purchased Tribune stock, or would not have done so at the inflated prices caused by the misstatements and omissions.

50. When the previously concealed risk – that regulators would decline to grant approval, and the Merger would therefore fail – materialized, the price of Tribune stock declined dramatically, and Plaintiffs and other investors lost hundreds of millions of dollars.

51. That Sinclair may now suggest in hindsight that the Merger might have been approved after an agreed further extension does not change the facts that Sinclair took action antagonistic to the government's position which jeopardized and ultimately derailed the Merger, and that the Tribune Defendants knew and failed to disclose those facts.

52. Notably, Plaintiffs do not allege that the Tribune Defendants set out to defraud the market or its shareholders when the Merger was announced in May 2017, but Plaintiffs need not prove such initial intent to defraud to show that the Tribune Defendants violated Section 10(b) of the Exchange Act. It is enough, as the facts demonstrate, to show that the Tribune Defendants failed to correct, continued to misstate, and continued to omit, material facts when they learned: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval, in

direct violation of the Merger Agreement; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures, a position that the DOJ and FCC had already rejected. The Tribune Defendants were motivated by, among other things, maintaining the inflation in Tribune stock price caused by the Merger announcement on the meager hope that the Merger would receive regulatory approval despite Sinclair's intransigence.

## II.  JURISDICTION AND VENUE

53.     This Court has jurisdiction over the subject matter of this Action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

54.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

55.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and Section 22 of the Securities Act, 15 U.S.C. § 77v.

56.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the use of a prospectus or registration statement, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

57.    Lead Plaintiff The Arbitrage Event-Driven Fund is a fund series of a Delaware statutory trust that seeks capital growth through an opportunistic and flexible approach to event-driven investing.  The multi-strategy fund invests in the equity and debt instruments of companies involved in corporate events. As set forth in the attached certification (Exhibit A), The Arbitrage Event-Driven Fund purchased shares of Tribune common stock during the Class Period and suffered damages due to the violations of the federal securities laws alleged herein.

58.    Lead Plaintiff The Arbitrage Fund is a fund series of a Delaware statutory trust that seeks capital growth through an investment approach focused on the strategy of merger arbitrage. The fund invests in companies being acquired in publicly announced mergers and acquisitions.  As set forth in the attached certification (Exhibit B), The Arbitrage Fund purchased shares of Tribune common stock during the Class Period and suffered damages due to the violations of the federal securities laws alleged herein.

59.    Lead Plaintiff the Water Island Merger Arbitrage Institutional Commingled Master Fund, LP is a Cayman Islands limited partnership which invests in the equity and debt instruments of companies involved in corporate events.  As set forth in the attached certification (Exhibit C), the Water Island Merger Arbitrage Institutional Commingled Master Fund, LP purchased shares of Tribune common stock during the Class Period and suffered damages due to the violations of the federal securities laws alleged herein.

60.    Lead Plaintiffs the Water Island Funds and their registered investment manager, Water Island Capital LLC, are headquartered in New York, New York.

61.    Plaintiff FNY Partners Fund LP is a Delaware limited partnership which invests in equity securities.  As set forth in the attached certification (Exhibit D), FNY Partners Fund LP

purchased shares of Tribune common stock: (i) during the Class Period; (ii) contemporaneously with Defendant Oaktree's sales in the Oaktree Offering; and (iii) pursuant or traceable to the Oaktree Offering, and suffered damages due to the violations of the federal securities laws alleged herein.

62.     Plaintiff FNY Managed Accounts, LLC is a Delaware limited liability company which invests in equity securities.  As set forth in the attached certification (Exhibit E), FNY Managed Accounts, LLC purchased shares of Tribune common stock: (i) during the Class Period; (ii) contemporaneously with Defendant Oaktree's sales in the Oaktree Offering; and (iii) pursuant or traceable to the Oaktree Offering, and suffered damages due to the violations of the federal securities laws alleged herein.

63.     The First New York Funds, and their registered investment manager, FNY Investment Advisers, LLC, are headquartered in New York, New York.

**B.     The Tribune Defendants**

64.     Defendant Tribune is a Delaware corporation headquartered in Chicago, Illinois. Tribune is a media company with a diverse portfolio of television and digital properties.  Tribune stock is traded on the New York Stock Exchange under the ticker symbol "TRCO."  As of August 9, 2018 (the day after the Merger failed) there were over 87.6 million shares of Tribune common stock outstanding.  Defendant Tribune is named in Count I (violation of Section 10(b) of the Exchange Act) and Count IV (violation of Section 11 of the Securities Act).

65.     Defendant Peter M. Kern resides in New York.  Defendant Kern has served as Chief Executive Officer of Tribune since March of 2017 and on Tribune's Board since October 2016.

66.     Defendant Chandler Bigelow resides in Illinois.  Defendant Bigelow has been Tribune's Chief Financial Officer and Executive Vice President since February 2016.

67.     Defendants Kern and Bigelow (the "<u>Executive Defendants</u>") signed, among other statements, Tribune's November 2017 Registration Statement and Prospectus, March 1, 2018 Form 10-K, and May 10, 2018 Form 10-Q which contained statements that were false, misleading and/or incomplete concerning Sinclair's conduct with respect to pursuing regulatory approval for the Merger.  Defendants Kern and Bigelow are named in Count I (violation of Section 10(b) of the Exchange Act) and Count IV (violation of Section 11 of the Securities Act).

68.     Defendants Tribune, Kern and Bigelow are referred to herein collectively as the "Tribune Defendants."

**C.     The Oaktree Defendants**

69.     Defendant Oaktree is a Delaware limited partnership headquartered in Los Angeles, California.  As of November 29, 2017, Oaktree was Tribune's largest shareholder.  Prior to the sale of seven million shares in the Oaktree Offering, Defendant Oaktree beneficially owned 14,145,447 shares of Tribune common stock.  As of December 31, 2016, Oaktree's Tribune holdings were managed by an investment committee comprised of Oaktree Capital senior personnel, including Mr. Karsh (Chairman of Tribune's Board until October 2017 and Oaktree Capital co-founder), Howard S. Marks (co-founder), John B. Frank (Vice Chairman), David M. Kirchheimer (Advisory Partner and former Principal and the Chief Financial Officer) and Stephen A. Kaplan (Advisory Partner and former head of Oaktree's Global Principal Group).[1]  Oaktree is named in Count II (violation of Section 20A of the Exchange Act).

---

[1] According to the Schedule 13G/A filed by Oaktree Capital Management, L.P., the general partner of Oaktree Tribune, L.P. is Oaktree AIF Investments, L.P. ("<u>AIF Investments</u>").  The general partner of AIF Investments is Oaktree AIF Holdings, Inc. ("<u>AIF Holdings</u>").  The holder of the voting shares of AIF Holdings is Oaktree Capital Group Holdings, L.P. ("<u>OCGH</u>").  The general partner of OCGH is Oaktree Capital Group Holdings GP, LLC ("<u>OCGH GP</u>").

70. Defendant Oaktree Capital is a leading global alternative investment management firm headquartered in Los Angeles, California. Defendant Oaktree Capital is the ultimate parent of Defendant Oaktree, and was the ultimate controlling entity of Defendant Oaktree, AIF Investments, AIF Holdings, OCGH and OCGH GP with respect to Defendant Oaktree's Tribune shares. According to Tribune's April 14, 2018 Form 14A, as of December 31, 2017, Defendant Oaktree Capital "reported sole voting power and sole dispositive power with respect to" Defendant Oaktree's Tribune shares. Defendant Oaktree Capital is named in Count III (violation of Section 20(a) of the Exchange Act).

**D. The Director Defendants**

71. Defendant Craig A. Jacobson resides in California. Defendant Jacobson was a member of Tribune's Board at all times during the Class Period and remains a director of Tribune. Beginning in October 2017, Defendant Jacobson served as a director of Oaktree Strategic Income Corporation and Oaktree Specialty Lending Corporation, specialty finance companies managed by Defendant Oaktree Capital.

72. Defendant Ross Levinsohn resides in California. Defendant Levinsohn was a member of Tribune's Board at all times during the Class Period and remains a director of Tribune.

73. Defendant Peter E. Murphy resides in California. Defendant Murphy was a member of Tribune's Board at all times during the Class Period and remains a director of Tribune.

74. Defendant Laura R. Walker resides in New York. Defendant Walker was a member of Tribune's Board at all times during the Class Period and remains a director of Tribune.

75. Defendants Jacobson, Levinsohn, Murphy and Walker signed Tribune's November 2017 Registration Statement and Prospectus, which contained statements that were false, misleading and/or incomplete concerning Sinclair's conduct with respect to pursing regulatory approval for the Merger.

-22-

76. Defendants Jacobson, Levinsohn, Murphy and Walker, who are referred to herein as the Director Defendants, are named in Count IV (violation of Section 11 of the Securities Act).

**E.  Defendant Morgan Stanley**

77. Defendant Morgan Stanley is a Delaware limited liability company headquartered in New York. Morgan Stanley was the sole underwriter of the Oaktree Offering pursuant to Offering Materials which contained statements that were false, misleading and/or incomplete concerning Sinclair's conduct with respect to pursuing regulatory approval for the Merger.

78. Defendant Morgan Stanley is named in Count IV (violation of Section 11 of the Securities Act) and Count V (violation of Section 12(a)(2) of the Securities Act).

## IV.  SUBSTANTIVE ALLEGATIONS

79. Tribune as it currently exists is one of the largest owners of local television stations in the United States. In total, Tribune owns or operates 42 stations in 33 markets. It also owns national entertainment network WGN America, regional cable news channel Chicagoland Television (CLTV), Chicago radio station WGN, digital multicast network Antenna TV, Tribune Studios, minority stakes in the TV Food Network and CareerBuilder, and a variety of real estate assets.

**A.  Background of Tribune**

80. The original Tribune Company ("Legacy Tribune") was founded in 1847 as the publisher of the Chicago Daily Tribune. Legacy Tribune began publishing a second newspaper, a tabloid called the New York News, in 1919. It entered radio broadcasting in 1924 and entered the television industry in 1948. Following growth both in print and broadcasting, Legacy Tribune became a public company in 1983. By 2006, Legacy Tribune had approximately 20,000 employees.

81.     In September 2006, Legacy Tribune revealed to the market it was available for sale by creating a special committee of the board of directors to consider restructuring, selling assets or taking the company private in a leveraged buyout.

82.     In April 2007, Legacy Tribune agreed to go private in an $8.2 billion leveraged-buyout (the "LBO") led by Chicago real estate tycoon Sam Zell.  In December 2007, the LBO closed, which loaded the company with about $13 billion in debt.

83.     In December 2008, Legacy Tribune filed for Chapter 11 bankruptcy protection under the weight of the debt brought on by the LBO.

84.     On December 31, 2012, after nearly four years in legal limbo, newly-reorganized Tribune emerged from bankruptcy.  Pursuant to Tribune's confirmed joint plan of reorganization proposed by its committee of unsecured creditors, which included Oaktree Capital, large creditors Oaktree Capital, Angelo, Gordon & Co. and JPMorgan Chase & Co. assumed control of the Company, with Oaktree Capital owning approximately 22 percent.  Oaktree, as the largest shareholder, was entitled to appoint two board members.

85.     Shortly thereafter, on January 17, 2013, Mr. Karsh was named Chairman of Tribune's Board.  While Mr. Karsh served as the Chairman, he was also acting as Oaktree Capital's Co-Chairman (since 2014) and Chief Investment Officer (since 2013), and as a member of Oaktree Capital's investment committee, which was charged with all decisions related to the disposition of Oaktree's Tribune stock.  At that time, Tribune's Board also included another Oaktree partner, as well as Director Defendant Jacobson, who is now on the board of two Oaktree Capital financing subsidiaries.

86.     In July 2013, Tribune announced plans to split into two companies, effectively ending an 89-year strategy of pairing broadcasting and print.  Tribune focused on broadcasting,

and a new company, Tribune Publishing, was created to focus on the newspaper properties. The assets were divided, with television stations, real estate and other valuable assets staying with Tribune.

87.     On August 4, 2014, Tribune completed the spin-off of Tribune Publishing, with Oaktree Capital, through Oaktree, owning 18.5 percent of Tribune Publishing and 18.5 percent of Tribune.

88.     At this point, Defendant Oaktree Capital began a pattern of intervention in deals involving the surviving entities. In April of 2016, Gannett Co., Inc. ("Gannett") made an offer to buy Tribune Publishing. After the board rejected Gannett's unsolicited offer, Defendant Oaktree Capital, who was Tribune Publishing's second-largest shareholder at the time (owning 14.8 percent of that company's stock through Defendant Oaktree), publicly urged Tribune Publishing's board to meet with Gannett. When Tribune Publishing's board subsequently responded by adopting a shareholder's rights plan (or "poison pill"), Defendant Oaktree Capital made another unequivocal demand to the board to negotiate with Gannett. When Tribune Publishing refused to make a deal with Gannett, Defendant Oaktree sold back its remaining shares to Tribune Publishing in a deal valued at more than $56 million. However, it continued to retain its interest in Tribune.

**B.     The Oaktree Defendants' Continued Interest in Tribune**

89.     Notwithstanding Defendant Oaktree's sale of its interest in Tribune Publishing, the Oaktree Defendants' interest and ownership in Tribune has remained fairly constant.

90.     In this regard, upon Tribune's emergence from bankruptcy, Defendant Oaktree owned 18.5 percent in December 2012. By March 2017, Defendant Oaktree maintained a 16.3 percent stake in Tribune.

91.     Additionally, since 2013 affiliates of Defendant Oaktree Capital have acted as syndicate lenders to Tribune. JPMorgan Chase Bank, N.A., an affiliate of the J.P. Morgan entities

which owned more than nine percent of Tribune's stock as of December 2012, is Tribune's long-time lender and agent under the Company's secured credit facility. The syndicate of lenders includes funds affiliated with Defendant Oaktree Capital. The funds affiliated with Defendants Oaktree Capital and Oaktree held $28 million and $31 million of the Company's term loans and former term loans at December 31, 2017 and December 31, 2016, respectively.

92.     Put simply, Oaktree Capital's connection with Tribune and participation in the Company's business decisions has a long history, facilitated by, among other things, Oaktree's having *at least* one designee to the Board, who also worked for Oaktree Capital, at all times from 2012 to October 2017. Likewise, since October 2017, Defendant Jacobson has served on Tribune's Board and the board of two of Oaktree Capital's financing subsidiaries.

### C.    Tribune's Management Positions the Company for Sale and Executes a Definitive Merger Agreement with Sinclair

93.     On February 29, 2016, Tribune announced that the "Board of Directors and the Company have initiated a process to explore the full range of strategic and financial alternatives to enhance shareholder value." These alternatives included seeking a merger or sale of the Company. Investors reacted swiftly and positively. Tribune's share price rose 9%, closing at $35.90 per share that day, up from $32.95 at close on the previous trading day (February 26). Tribune's share price rose again the next day, closing at $37.91 on March 1, 2016, up more than 15% from its close on the day before the announcement.

94.     That same month, February 2016, Defendant Bigelow was appointed Chief Financial Officer, and Mr. Lazarus, already Tribune's general counsel, was appointed to serve as its Chief Strategy Officer.

95.     As announced, Tribune and its Board did indeed explore opportunities to sell the Company throughout the remainder of 2016, and negotiations regarding a possible acquisition by

Sinclair began in earnest by at least November 2016. After negotiations between Tribune and Sinclair were underway, Tribune appointed Defendant Kern as interim Chief Executive Officer. Tribune's message to Defendants Bigelow and Kern, as well as Mr. Lazarus was clear: they had been appointed to their positions to sell the Company.

96.     On March 1, 2017, Reuters reported that Sinclair executives had approached Tribune about a possible acquisition.  Investors again responded swiftly and positively to the news of a potential sale, and Tribune stock rose 8%, closing at $37.38 per share that day, up from $34.52 at close on the previous day.

97.     On May 8, 2017, Tribune announced that it had entered into the Merger Agreement with Sinclair, pursuant to which Sinclair would acquire Tribune's outstanding stock and Tribune shareholders would receive cash plus Sinclair stock for a total value of $43.50 per share.  Investors reacted positively to the news and Tribune's stock price closed at $42.40 per share on May 8, 2017, up 5% from $40.29 at close on the previous trading day, up more than 22% from its close on February 28, 2017, the day before the negotiations were reported in the media, and up more than 28% from the day before management announced the strategic review in February 2016.

98.     As Defendant Kern explained in the May 8, 2017 press release, the announcement of the Merger Agreement with Sinclair was "the culmination of an extensive strategic review, which has delivered significant value to our stockholders."  Kern's statement confirmed that the "extensive strategic review" he referred to was the strategic review that Tribune announced in February 2016, "15 months ago."

### D. The Tribune Defendants' Pre-Class-Period Statements Regarding Sinclair's Purported Agreement to Sell Stations as Necessary to Obtain Regulatory Approval

99.     As multiple analysts explained when the Merger Agreement was announced, and as Tribune and Sinclair openly discussed in their regulatory filings concerning the Merger, a combination of the two companies would trigger regulatory scrutiny by both the DOJ and the FCC.

100.    Understanding that its investors and prospective investors would be concerned about such regulatory approval, Tribune immediately sought to allay those concerns.  In its May 8, 2017 press release, Tribune explained that, "In order to comply with FCC ownership requirements and antitrust regulations, Sinclair may sell certain stations in markets where it currently owns stations.  Such divestitures will be determined through the regulatory approval process."  This statement caused investors to believe: (i) that Sinclair would make the station divestitures required to obtain regulatory approval; and (ii) that Sinclair agreed with Tribune that Sinclair was legally obligated to do so.

101.    The next day, May 9, 2017, Tribune publicly filed its Form 8-K announcing the Merger Agreement with the SEC.  The Form 8-K attached as exhibits Tribune's May 8, 2017 press release and the Merger Agreement itself.  The Merger Agreement contained specific obligations requiring Sinclair to make station divestitures to secure regulatory approval:

> [Sinclair] shall use reasonable best efforts to take action to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably practicable, including . . . the proffer and agreement by [Sinclair] of its willingness to sell, lease, license or otherwise dispose of, or hold separate pending such disposition, and promptly to effect the sale, lease, license, disposal and holding separate of, such assets, rights, product lines, categories of assets or businesses or other operations or interests therein of [Sinclair] or any of its Subsidiaries [ ] (hereinafter referred to as the "Station Divestitures") and . . . the proffer and agreement by [Sinclair] of its willingness to take such other actions, and promptly to effect such

other actions (and the entry into agreements with, and submission to orders of, the relevant Governmental Authority giving effect thereto, including the entry into hold separate arrangements, terminating, assigning or modifying Contracts (or portions thereof) or other business relationships, accepting restrictions on business operations and entering into commitments and obligations) (each an "Approval Action").

102.    As is customary, and as explained in the Merger Agreement itself, the publicly-filed Merger Agreement incorporated by reference a Confidential Memorandum signed by both Tribune and Sinclair, which contained additional disclosures, representations and warrantees that Tribune and Sinclair made to each other as part of the Merger Agreement, but which they chose not to make public at that time.

103.    However, unbeknownst to the public, as Tribune later revealed in its August 9, 2018 verified complaint against Sinclair in the Delaware Merger Litigation, "from virtually the moment the Merger Agreement was signed, Sinclair repeatedly and willfully breached its contractual obligations in spectacular fashion." These breaches related to Sinclair's obligation to divest stations in order obtain regulatory approval for the Merger. As Tribune has alleged in the Delaware Merger Litigation, after signing the Merger Agreement, "Sinclair repeatedly favored its own financial interests over its contractual obligations by rejecting clear paths to regulatory approval. Instead, Sinclair fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell [to obtain antitrust clearance]."

104.    Tribune did not inform the investing public that Sinclair was breaching the Merger Agreement by refusing to make station divestitures, information that was necessary to correct the misimpression given by the May 8, 2017 press release that Sinclair would willingly make the divestitures needed to obtain prompt regulatory approval. Instead, Tribune doubled down in the

September 2017 Proxy by making stronger and more specific claims about Sinclair's obligation

and intention to cooperate with regulators, including the fact that Sinclair had allegedly agreed to

divest stations in ten specific overlap markets.

105. Specifically, in the September 2017 Proxy inviting its shareholders to approve the

Merger, Tribune stated:

> Under the merger agreement, Sinclair and Tribune each agreed, subject to the terms of the merger agreement, to use its reasonable best efforts, to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable law to complete the merger and the other transactions contemplated by the merger agreement as promptly as reasonably practicable.
>
> Sinclair also agreed, subject to the terms of the agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions, each referred to as an "approval action," to obtain regulatory approval.
>
> In that connection Sinclair agreed to divest one or more television stations in the following Nielsen "Designated Market Areas": (i) Seattle-Tacoma, Washington, (ii) St. Louis, Missouri, (iii) Salt Lake City, Utah, (iv) Grand Rapids-Kalamazoo-Battle Creek, Michigan, (v) Oklahoma City, Oklahoma, (vi) Wilkes Barre-Scranton, Pennsylvania, (vii) Richmond-Petersburg, Virginia, (viii) Des Moines-Ames, Iowa, (ix) Harrisburg-Lancaster-Lebanon-York, Pennsylvania and (x) Greensboro-High Point Salem, North Carolina, which we refer to as the "overlap markets", as necessary to comply with the FCC's Local Television Multiple Ownership Rule (47 C.F.R. § 73.3555(b)), which we refer to as the "FCC duopoly rule," or to obtain clearance under the HSR Act, in each case as required by the applicable governmental authority in order to obtain approval of and consummate the transactions. Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each overlap market, as required by and subject to approval by the relevant governmental authority. Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. §

-30-

73.3555(e)), which we refer to as the "FCC national cap," as required by the FCC in order to obtain approval of and consummate the transactions.

106.     Soon thereafter, Sinclair privately displayed its obstreperous approach toward government regulators, and the threat that this approach posed to the Merger was made plain to the Tribune Defendants.  At Sinclair's request, Tribune had given Sinclair some latitude in its approach while the nomination of incoming Assistant Attorney General in charge of Antitrust, Makan Delrahim, was pending.  Shortly after AAG Delrahim took office in September 2017, he made clear that he was focused on divestitures in the ten identified overlap markets, and that Sinclair's agreement to divestitures in those markets would bring a halt to the DOJ's investigation and facilitate the path to approval contemplated by the Merger Agreement. Sinclair nevertheless continued to try, without success, to persuade the DOJ that divestitures in most of the ten overlap markets should not be required to approve the Merger. In early October 2017 the DOJ reaffirmed that it was continuing its investigation of all ten of the identified overlap markets.

107.     On October 19, 2017, Tribune shareholders approved the Merger with more than 99 percent favorable votes.  Defendant Kern issued a release stating that "[t]oday's vote is an important milestone in the merger process and confirms that Tribune stockholders strongly support this transaction and the value it delivers."

108.     At this point, with overwhelming support for the Merger and the stock price increases it had caused for more than a year, the Tribune Defendants were committed.

109.     Accordingly, the Tribune Defendants failed to correct the statements in the September 2017 Proxy, even when they learned no later than November 20, 2017: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures.

110.    The Tribune Defendants also subsequently repeated the substance of the foregoing statements during the Class Period and continued to fail to correct these previous statements.

### E.    The Tribune Defendants and the Oaktree Defendants Learn that Sinclair Is Refusing to Make the Previously-Agreed-To Divestitures, but the Tribune Defendants Continue to Assure Investors that Sinclair Intends to Do So

111.    On November 17, 2017, DOJ staff sent Sinclair a letter stating that none of Sinclair's arguments had persuaded them as to any of the overlap markets. That same day, AAG Delrahim called Sinclair's antitrust counsel (William Kolasky) and Tribune's outside regulatory counsel, to convey the DOJ's official position that the DOJ's concerns with the Merger could be resolved if Sinclair agreed to divest stations in eight to ten of the overlap markets.

112.    By virtue of their positions on the Board, the Director Defendants were aware of this communication and its significance to the Merger.

113.    Because of their relationship with Tribune and their access to internal Company documents, including their shared board member, the Oaktree Defendants were also aware of this communication and its significance to the Merger.

114.    The DOJ's position was consistent with Tribune's expectation, expressed in and implied by the Merger Agreement, the Disclosure Memorandum at Schedule 7.1, the September 2017 Proxy, and the Tribune Defendants' other prior public statements regarding Sinclair's obligations, that the DOJ would require station divestitures in order to grant antitrust clearance through the regulatory process and that Sinclair's commitment to divest stations in up to ten markets would satisfy the DOJ's requirement.

115.    The Tribune Defendants had understood, and had led investors to understand, that Sinclair would accept any offer by the DOJ to grant antitrust clearance in return for divestures in

the agreed-to and explicitly-listed markets. The DOJ's November 17, 2017 communication was such an offer.

116. But Sinclair rejected the DOJ's November 17, 2017 offer, and on November 20, 2017, the DOJ refused to pause its investigatory depositions, which were set to begin that week, unless and until Sinclair "put station divestitures on the table." Sinclair flatly refused even to make this show of good faith, thereby causing the investigatory depositions to go forward.

117. Tribune correctly considered Sinclair's rejection of the DOJ's November 17 offer and November 20 refusal even to consider station divestitures to be inconsistent with Sinclair's obligations under the Merger Agreement. Tribune formally memorialized this opinion in a December 18, 2017 letter from Mr. Lazarus to Sinclair's general counsel, copying Defendant Kern as well as Sinclair's chief executive and outside counsel for both Tribune and Sinclair. Given the importance of the content of the letter and the detailed analysis therein, Tribune must have come to this conclusion well before the letter was sent, because the letter would have been reviewed by the senior executives and by outside and internal counsel for Tribune. Further, Sinclair made a detailed response the same day, denying that it was obligated to accept the DOJ's offer or otherwise cooperate with regulators, indicating that Tribune had previously expressed the opinions in its letter to Sinclair and that Sinclair had previously considered and rejected Tribune's analysis after consulting its own counsel.

118. Accordingly, if the Tribune Defendants did not previously know that the statements in Tribune's September 2017 Proxy regarding Sinclair's intentions were false and misleading, they learned that those statements were false no later than November 20, 2017.

119. Nine days later, armed with the material, non-public information that Sinclair was refusing to divest stations in breach of the Merger Agreement, thereby threatening the Merger, the

Oaktree Defendants, rushed to cash out seven million shares of Tribune common stock in the Oaktree Offering for total proceeds that were $21.98 million less than they would receive in the Merger, if it had occurred, but ultimately avoided more than $42 million in losses when it failed.

**F.     The Tribune Defendants' Class-Period Misrepresentations and Omissions of Material Fact Regarding Sinclair's Refusal to Divest Stations as Necessary to Obtain Regulatory Approval**

120.     On November 29, 2017 Tribune announced the Oaktree Offering of seven million shares of Tribune common stock owned by Defendant Oaktree.  Pursuant to the Offering Materials, Defendant Oaktree agreed to sell seven million shares at $40.36 per share to underwriter Defendant Morgan Stanley, who was authorized by the Offering Materials and the underwriting agreement to offer those shares to the public.  On information and belief, and based on subsequent SEC filings and Bloomberg historical price and volume data, Defendant Morgan Stanley offered those shares to the public at $40.76 per share over the following several trading days.

121.     Rather than correcting Tribune's September 2017 Proxy misstatements by disclosing to the investing public that Sinclair was refusing to divest stations in violation of an important provision of the Merger Agreement, thereby placing the Merger in jeopardy, Tribune *repeated* the substance of those statements in the Registration Statement and Prospectus for the Oaktree Offering.[2]  The Registration Statement and Prospectus states:

> Under the Merger Agreement, Sinclair and Tribune each agreed, subject to the terms of the Merger Agreement, to use its reasonable best efforts, to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable law to complete the Merger and the other transactions contemplated by the Merger Agreement as promptly as reasonably practicable. Sinclair also agreed, subject to the terms of the Merger

---

[2] Director Defendant Craig Jacobsen was a member of the Tribune Board of Directors at the time of the filing of the Offering Materials with respect to which liability is asserted in this Action for the Oaktree Offering.

Agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions (each, an "approval action") to obtain regulatory approval. In that connection Sinclair agreed to divest one or more television stations in the following Nielsen "Designated Market Areas": (i) Seattle-Tacoma, Washington, (ii) St. Louis, Missouri, (iii) Salt Lake City, Utah, (iv) Grand Rapids-Kalamazoo-Battle Creek, Michigan, (v) Oklahoma City, Oklahoma, (vi) Wilkes Barre-Scranton, Pennsylvania, (vii) Richmond-Petersburg, Virginia, (viii) Des Moines-Ames, Iowa, (ix) Harrisburg-Lancaster-Lebanon-York, Pennsylvania and (x) Greensboro-High Point Salem, North Carolina (collectively, the "overlap markets") as necessary to comply with the FCC's Local Television Multiple Ownership Rule (47 C.F.R. § 73.3555(b)) (the "FCC duopoly rule") or to obtain clearance under the HSR Act, in each case as required by the applicable governmental authority in order to obtain approval of and consummate the Merger. Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each overlap market, as required by and subject to approval by the relevant governmental authority. Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the, FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)) (the "FCC national cap") as required by the FCC in order to obtain approval of and consummate the Merger.

122.    These statements were false and misleading, and omitted material facts necessary to make the statements not misleading, because the Tribune Defendants knew no later than November 20, 2017: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures.

123.    While the Registration Statement and Prospectus correctly warned that "[f]ailure to obtain the necessary governmental approvals and consents would prevent the parties from consummating the proposed Merger," it made the further misleading statement that: "[t]here can be no assurance that the actions Sinclair is required to take under the Merger Agreement to obtain

-35-

the governmental approvals and consents necessary to complete the Merger will be sufficient to obtain such approvals and consents or that the divestitures contemplated by the Merger Agreement to obtain necessary governmental approvals and consents will be completed." In fact, the Tribune Defendants already knew that the DOJ had already determined that the station divestitures, if made, would be adequate to achieve approval *and that*, in fact, the divestitures were unlikely to be completed because of Sinclair. Yet the Tribune Defendants did not disclose that Sinclair had recently refused to commit to divestitures in eight of the ten listed markets even when the DOJ offered to grant antitrust clearance in return, conduct that Tribune considered a breach of the Merger Agreement. Nor did the Tribune Defendants disclose that Sinclair had further refused to even "put station divestitures on the table" and had thereby necessitated investigatory depositions which would delay and jeopardize regulatory approval. These omissions further rendered Tribune's statements in the November 29, 2017 Registration Statement and Prospectus false and misleading.

124. The Registration Statement and Prospectus were further misleading because, given Sinclair's conduct before the DOJ, and the attendant delays in both antitrust clearance and FCC approval, it was not reasonable to anticipate that the Merger would close in the first quarter of fiscal 2018, or soon thereafter, as stated in the Registration Statement and Prospectus.

125. The Tribune Defendants and Oaktree were aware that the Registration Statement and Prospectus and other Offering Materials filed in relation to the Oaktree Offering contained false and misleading statements, but nonetheless proceeded with the Oaktree Offering, which lasted through December 4, 2017.

126. Sinclair's failure to make station divestitures as required to obtain regulatory approval continued despite Tribune's protestations. In mid-January, DOJ staff, on a call with Mr.

Kolasky, again communicated that the DOJ was considering divestitures only in the overlap markets and not in any other markets. On January 24, 2018, in an email to AAG Delrahim and other DOJ staff, Mr. Kolasky wrote that the DOJ had told Sinclair that it was focused just on the ten markets described in Tribune's public statements as agreed-to and that a sale of additional stations in other markets was not a condition to any settlement. Also on January 24, 2018, Tribune once again urged Sinclair to comply with its obligations under the Merger Agreement in an email sent by Defendant Kern to Sinclair's CEO the day before what was intended to be Sinclair's final front office meeting with the DOJ, which is typically the last official meeting with the DOJ before the DOJ concludes its investigation and decides whether to sue. Mr. Kern wrote, in relevant part:

> While I know you are well aware of our position and your contractual obligations, and at the risk of belaboring the point – in the event DOJ offers to end its investigation if Sinclair agrees to divest stations within the ten overlap DMAs [markets] spelled out in the merger agreement, you are contractually bound to accept.

127.    Sinclair's CEO responded the same day, writing only that: "Although I do not think it is productive to engage in a legal debate with you, for the record I am writing to advise you that we disagree with the legal conclusion stated in your email as to Sinclair's contractual obligations."

128.    As expected, the DOJ offered at the January 25 meeting to end its investigation upon Sinclair's agreement to divest stations within the ten overlap markets. As in November and December, however, Sinclair refused to agree to divestitures in all ten of the overlap markets. It offered sales in just four overlap markets and declared that it intended, and indeed welcomed the opportunity, to litigate with the DOJ. Underscoring Sinclair's willful breach, Sinclair's general counsel in fact told AAG Delrahim: "sue me." Before leaving the DOJ's office after the meeting, Sinclair's general counsel also told Mr. Lazarus that Tribune would have to sue Sinclair to get it to divest stations in all ten markets previously described in Tribune's public filings as agreed-to.

129.    The Tribune Defendants were aware of this conduct because Tribune's representatives attended the January 25 meeting.

>    1.    *Tribune Learns that Sinclair is Proposing a Divestiture Process that the FCC has Never Approved, And Related-Party Sham Transactions that the FCC Would Never Approve, Further Jeopardizing the Merger*

130.    Sinclair created yet more problems when it purported to identify specific stations to be divested to comply with the National Cap.  Sinclair could have readily complied with the rule in a variety of non-controversial ways, including by simply agreeing to sell certain stations to unrelated third parties in truly arm's-length transactions.

131.    But, rather than take this more certain and expeditious route to deal approval, which Tribune had publicly stated Sinclair was obligated to take, Sinclair decided in February 2018 to take another high-risk approach.

132.    In a proposal that Sinclair submitted to the FCC on February 20, 2018 and supplemented on February 27, 2018, Sinclair proposed station sales to parties with significant ties to Sinclair's Executive Chairman, David Smith, and his family, coupled with joint sales and shared services agreements under which Sinclair would effectively control all aspects of station operations, including advertising sales and the negotiation of retransmission agreements with cable and satellite operators.  Under these proposed arrangements, Sinclair would continue to reap the lion's share of the economic benefits of the stations it was purportedly "divesting" and would have an option to repurchase the stations in the future.  The Tribune Defendants were aware that Sinclair was making this proposal.

133.    Sinclair proposed, among other things, selling WGN-TV in Chicago to Steven Fader, a close associate of Smith's who had no experience in broadcasting.  Sinclair also proposed the sale of WPIX, a New York station, to Cunningham Broadcasting Corporation, a company that

owns numerous television stations that are operated by Sinclair employees under joint sales and shared services agreements, had tens of millions of dollars in debt guaranteed by Sinclair, and had been controlled by the estate of Smith's late mother until January 2018.

134.     Tribune warned Sinclair that proposing these related-party "sales" was incompatible with using best efforts to obtain prompt regulatory approval.   The Tribune Defendants were fully aware that Sinclair's aggressive proposals would slow – or altogether stop – the FCC's review process and undermine the prospects for approval by subjecting the divestitures to intense regulatory scrutiny, particularly given that they involved stations in the first and third largest television markets in the United States.

135.     As Tribune expected, the FCC staff expressed frustration over what they viewed as the unacceptably aggressive terms of Sinclair's proposed divestitures, making clear their position that Sinclair's relationships with the purchasers and the terms of the sales would enable Sinclair, effectively, to maintain operational control over the stations.   That is, contrary to Tribune's prior assurances to the investing public, Sinclair did not actually "designate . . . certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)) [ ] as required by the FCC in order to obtain approval of and consummate the Merger." The FCC staff advised Sinclair to instead propose "clean" divestitures, *i.e.*, arm's-length sales to truly independent third parties.

136.     In addition to these sham "related-party sales," Sinclair proposed to the FCC the use of a contingent divestiture trust.   Under the proposal Sinclair would place 23 stations in a contingent trust whereby, prior to consummation of the Merger, the trust would dispose of certain stations and transfer the others back to Sinclair.   Such an arrangement would permit Sinclair to

delay the sale of any stations and, to the extent it did intend to sell, allow it time to determine the most financially beneficial group of stations to keep.

137.    Significantly, as was their pattern, the Tribune Defendants did not disclose that Sinclair was delaying regulatory approval by refusing to propose to the FCC the station sales needed to satisfy the Duopoly Rule against multi-station ownership in a single market and National Cap until after it finished haggling with the DOJ over antitrust clearance, conduct that Tribune has testified caused Tribune's "breaching conduct" in rejecting the DOJ's November 17, 2017 offer to be a "double whammy."

138.    The Tribune Defendants simply did not disclose to the investing public that Sinclair was undermining the prospects for approval of the Merger by proposing apparent sham transactions, that Sinclair's conduct was inconsistent with Tribune's prior statements regarding Sinclair's obligations, that the FCC had expressed frustration, that the FCC viewed Sinclair's proposed divestitures as "unacceptably aggressive," that the FCC advised Sinclair to instead propose "clean divestitures," or that Sinclair ignored the advice of both Tribune and the FCC.

> 2.    *Tribune Continues to Assure Investors That Sinclair is Using Best Efforts to Obtain Regulatory Approval, Including Making the Required Station Divestitures*

139.    In Tribune's Form 10-K for 2017, filed March 1, 2018, the Tribune Defendants again failed to disclose that Sinclair had put the Merger in grave jeopardy by refusing to make reasonable and previously-agreed efforts to obtain regulatory approval. Instead, Tribune stated that "[w]e currently anticipate the Merger will close in the second quarter of fiscal 2018" (*i.e.* one-to-four months from the date of that filing), and simply repeated its generic recitation of risk factors related to the Merger Agreement, stated previously in its Registration Statement and Prospectus and other Offering Materials, including the general possibility that regulatory approval would not

be obtained. Once again, the recitation of these "risk factors" was meaningless, and indeed misleading, when the Tribune Defendants already knew the risk was materializing.

140. Moreover, Tribune again assured the investing public that Sinclair had agreed to make station divestitures as required by government regulators to obtain regulatory approval.

141. Tribune stated therein:

> Sinclair also agreed, subject to the terms of the Merger Agreement, to use reasonable best efforts to take all actions to avoid or eliminate each and every impediment that may be asserted by any governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions (each, an "approval action") to obtain regulatory approval. Specifically, Sinclair agreed to divest one or more television stations in the following Nielsen DMAs: (i) Seattle-Tacoma, Washington, (ii) St. Louis, Missouri, (iii) Salt Lake City, Utah, (iv) Grand Rapids-Kalamazoo-Battle Creek, Michigan, (v) Oklahoma City, Oklahoma, (vi) Wilkes Barre-Scranton, Pennsylvania, (vii) Richmond-Petersburg, Virginia, (viii) Des Moines-Ames, Iowa, (ix) Harrisburg-Lancaster-Lebanon-York, Pennsylvania and (x) Greensboro-High Point Salem, North Carolina (collectively, the "overlap markets") as necessary to comply with the Duopoly Rule or to obtain clearance under the HSR Act, in each case as required by the applicable governmental authority in order to obtain approval of and consummate the Merger, and if necessary or advisable to avoid, prevent, eliminate or remove the actual, anticipated or threatened commencement of any proceeding in any forum or issuance of any order that would delay, restrain, prevent, enjoin or otherwise prohibit consummation of the transactions contemplated by the Merger Agreement by any governmental authority.

> Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each overlap market, as required by and subject to approval by the relevant governmental authority. Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)) (the "FCC National Cap") as required by the FCC in order to obtain approval of and consummate the Merger.

-41-

142.    Tribune's statements in its March 1, 2018 Form 10-K were false and misleading, and omitted material facts necessary to make the statements not misleading, because Defendants knew no later than November 20, 2017: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures; and (iii) that Sinclair was proposing sham transactions to the FCC.

143.    The March 1, 2018 Form 10-K was further misleading because it stated that Tribune anticipated that the Merger would close in the second quarter of fiscal 2018 without disclosing that: (a) Sinclair had refused to make divestitures in the ten markets required for antitrust approval; (b) the FCC had advised Sinclair that its proposed divestiture structure was a non-starter and that its proposal to sell stations to related parties was problematic; (c) Sinclair had invited the DOJ to "sue me"; (d) Tribune executives understood that Sinclair's conduct had delayed the Merger and put its consummation at risk; (e) Tribune considered Sinclair's conduct a breach of the Merger Agreement; (f) Sinclair disagreed with Tribune regarding its obligation to make reasonable best efforts to obtain regulatory approval; and (g) Tribune had been forced twice to threaten to sue Sinclair to attempt to obtain its compliance with the Merger Agreement, with unsuccessful results.

144.    Tribune stock closed at $42.06 per share on March 2, 2018, indicating that investors perceived a high degree of certainty that the Merger would close, as Tribune "anticipate[d]" in its March 1, 2018 Form 10-K.

   3.    *Tribune Never Voluntarily Discloses Sinclair's Intransigent Conduct to Investors*

145.    On March 6, 2018 Sinclair withdrew its February 20 proposal to the FCC to utilize a contingent divestiture trust.  However, it filed another application the same day proposing the

same basic sham approach, but with five fewer stations in the trust. On April 24, 2018, Sinclair withdrew its second divestiture trust proposal.

146.    On May 10, 2018, Tribune filed its Form 10-Q for the second quarter of 2018. Like Tribune's prior Class Period filings, the Form 10-Q provided detail concerning the purported progress of regulatory approval for the Merger. While the filing for the first time revealed that regulatory pressure was causing Sinclair and Tribune to modify previous applications, the Form 10-Q still represented, misleadingly, that Sinclair was making good-faith proposals to comply with the divestiture requirements of the regulations and Merger Agreement:

> On April 24, 2018, the parties jointly filed (1) an amendment to the Applications [ ] that superseded all prior amendments and . . . provided additional information regarding station divestitures proposed to be made by Sinclair in 15 television markets in order to comply with the Duopoly Rule or the National Television Multiple Ownership Rule, (2) a letter withdrawing the Divestiture Trust Applications and (3) a letter withdrawing the application for approval of the sale of WPIX-TV to a third-party purchaser. In order to facilitate certain of the compliance divestitures described in the April 24 Amendment, between April 24, 2018 and April 30, 2018, Sinclair filed applications seeking FCC consent to the assignment of license or transfer of control of certain stations in 11 television markets.

147.    Moreover, Tribune's May 10, 2018 Form 10-Q, like its prior filings, did not disclose: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; or (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures. Moreover, it did not disclose either that the "modifications" were so extensive that Tribune and Sinclair were essentially starting from scratch, that Sinclair's prior behavior toward regulators had provoked the regulators' frustration and scrutiny (including numerous depositions), or that Tribune had twice been forced to threaten Sinclair with litigation to cause it to make reasonable concessions to regulators. Perhaps more significantly, the filing did

not disclose that the current, modified proposals involved sham related-party transactions similar to the proposed transactions regulators had previously rejected.

148. As set forth above, the statements in Tribune's September 2017 Proxy, Offering Materials, and March 1, 2018 Form 10-K, and May 10, 2018 Form 10-Q (¶¶ 56, 64, 81, 88) were false and misleading, and omitted material facts necessary to make the statements not misleading, because Defendants knew no later than November 20, 2017: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval, and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures.

### G. The Truth Is Revealed by the FCC Chairman

149. Remarkably, the Tribune Defendants never voluntarily disclosed Sinclair's conduct or its material risk to the Merger, nor corrected any of their previous statements that begin no later than the September 2017 Proxy representing that Sinclair had agreed to and was proceeding with the necessary station divestitures. Instead, Tribune investors and the market learned from the FCC when, on July 16, 2018, Chairman Pai made his unexpected announcement:

> Based on a thorough review of the record, I have serious concerns about the Sinclair/Tribune transaction. The evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law. When the FCC confronts disputed issues like these, the Communications Act does not allow it to approve a transaction. Instead, the law requires the FCC to designate the transaction for a hearing in order to get to the bottom of those disputed issues. For these reasons, I have shared with my colleagues a draft order that would designate issues involving certain proposed divestitures for a hearing in front of an administrative law judge.

150. It was only when forced by the FCC's announcement that Tribune disclosed issues with the Merger, and, even then, the Company did not acknowledge that it knew Sinclair's conduct had placed the Merger at risk from virtually the beginning. In a press release on July 17, 2018,

-44-

Tribune stated only that it would "review" the situation and "work with the FCC," but that it was "difficult to explain" the potential effect on the Merger:

> Tribune Media was disappointed to learn that the Chairman had circulated an order designating certain issues for consideration by an Administrative Law Judge. It will review the FCC's hearing designation order when released and expects to work with the FCC to explore ways to address the concerns identified. Until we have reviewed the order it is difficult to explain the potential issues it might create for the transaction.

151. Tellingly, Tribune's putative "review" of the situation did not last long. On August 9, 2018, Tribune issued a press release announcing it was abandoning the merger and finally disclosing Sinclair's refusal to divest stations to achieve regulatory approval:

> In the Merger Agreement, Sinclair committed to use its reasonable best efforts to obtain regulatory approval as promptly as possible, including agreeing in advance to divest stations in certain markets as necessary or advisable for regulatory approval. Instead, in an effort to maintain control over stations it was obligated to sell, Sinclair engaged in unnecessarily aggressive and protracted negotiations with the [DOJ] Department of Justice and the [FCC] over regulatory requirements, refused to sell stations in the markets as required to obtain approval, and proposed aggressive divestment structures and related-party sales that were either rejected outright or posed a high risk of rejection and delay—all in derogation of Sinclair's contractual obligations. Ultimately, the FCC concluded unanimously that Sinclair may have misrepresented or omitted material facts in its applications in order to circumvent the FCC's ownership rules and, accordingly, put the merger on indefinite hold while an administrative law judge determines whether Sinclair misled the FCC or acted with a lack of candor.

152. What the press release did not disclose, which Tribune revealed in its complaint and exhibits thereto in the Delaware Merger Litigation, filed the same day, is that the Tribune Defendants had known about Sinclair's forgoing conduct and refusal to divest stations virtually since May 2017, and before the September 2017 Proxy that caused shareholders to overwhelmingly approve the Merger:

> [F]rom virtually the moment the Merger Agreement was signed,
> Sinclair repeatedly and willfully breached its contractual obligations
> in spectacular fashion.

153.    The Delaware Merger Litigation is currently ongoing, and the parties to that action are engaged in discovery.

## V.    ADDITIONAL ALLEGATIONS OF SCIENTER

154.    The Tribune Defendants had *actual knowledge*: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures because: (a) they or their representatives were present at meetings with Sinclair and government regulators at which Sinclair representatives were combative, uncooperative and antagonistic to the regulators; (b) they were copied on or forwarded correspondence between government regulators and Sinclair in which Sinclair was combative, uncooperative and antagonistic to the regulators; and (c) they received correspondence from Sinclair expressly refusing to honor the obligations ascribed to Sinclair in Tribune's public filings.  Sinclair's breaching conduct on or about November 20, 2017 in refusing to accept the DOJ's offer to approve the Merger if Sinclair committed to divestitures was known to the Tribune Defendants contemporaneously with the conduct as evidenced by Tribune's December 18, 2017 letter describing Sinclair's exchange with government regulators.

155.    The Tribune Defendants were also aware of these developments because Sinclair was contractually required to keep Tribune informed of communications with government regulators about the Merger.  Indeed, Section 7.1(h) of the Merger Agreement provides:

> Unless prohibited by applicable Law or Order or by the applicable
> Governmental Authority, each of the Company and [Sinclair] shall
> (i) to the extent reasonably practicable, not participate in or attend
> any meeting, or engage in any substantive conversation, with any
> Governmental Authority in respect of the Merger (including with
> respect to any of the actions referred to in Section 7.1(a) [regarding]
> regulatory approval]) without the other, (ii) to the extent reasonably

practicable, give the other reasonable prior notice of any such meeting or conversation and (iii) in the event one such Party is prohibited by applicable Law or Order or by the applicable Governmental Authority from participating or attending any such meeting or engaging in any such conversation, keep the non-participating Party reasonably apprised with respect thereto.

156.    The Tribune Defendants were motivated to conceal Sinclair's conduct and the fact that it jeopardized the Merger (*i.e.* disinclined to publicly admit that the Merger was in grave jeopardy) because the Merger Agreement was the culmination of an arduous and expensive process that was announced in early 2016, and the failure to consummate it would cause Tribune's stock-price to fall to pre-announcement levels.

157.    Moreover, as Defendant Kern explained during an August 9, 2018 earnings call with investors after the Merger Agreement was terminated: "when a company spends 15 months trying to close a deal and doesn't, it's always hard on an enterprise and disappointing for a lot of people who invested their blood, sweat and tears in trying to do what they were asked to do, which is close the deal. . . . whenever you undertake an exercise like that, it's a disappointing [*sic*] not to finish."

158.    Furthermore, the Executive Defendants were implicitly appointed to their positions for the purpose of selling the Company.  Defendant Bigelow and Mr. Lazarus were appointed to their positions in February 2016, contemporaneously with the Board's decision to explore a sale of the company, and Defendant Kern was named interim CEO while Tribune was in confidential negotiations with Sinclair.  The Executive Defendants were motivated to avoid the revelation that they failed in their primary assignment and were outmaneuvered by Sinclair if there was any possibility the Merger would actually close.

159.    After the dissemination of the false and misleading statements described above, but before the undisclosed risk materialized and the truth emerged, Defendant Kern was elected by

shareholders to serve as a Class II director until 2021, and a resolution on executive compensation, including compensation to each of the Executive Defendants was approved by the shareholders, both on May 30, 2018.

160. Tellingly, Tribune's annual definitive proxy statements on Form 14A indicate that Defendant Bigelow and Mr. Lazarus (who was communicating directly with Sinclair) materially decreased their holdings of Tribune common stock from 2017 to 2018, despite the fact the Merger was purportedly forthcoming. For example, Tribune's March 24, 2017 Form 14A indicates that Defendant Bigelow owned 125,047 shares and Mr. Lazarus owned 115,389 shares of Tribune common stock as of March 17, 2017. By contrast, Tribune's April 19, 2018 Form 14A indicates these holdings fell to 88,301 and 79,290 as of March 31, 2018. Put another way, during the year the Merger was announced and Sinclair then non-publicly resisted station divestitures, putting the Merger at risk, Defendant Bigelow and Mr. Lazarus decreased their common share ownership by 29.3 percent and 31.2 percent, respectively.

161. On information and belief, Defendant Oaktree likewise had *actual knowledge*: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures. Until October 2017, Mr. Karsh was a member of both Tribune's Board and Oaktree's committee charged with decisions regarding the disposition of Tribune's stock. That Oaktree had actual knowledge of these undisclosed facts is consistent with Oaktree's position as Tribune's largest shareholder and its historically close relationship with the company.

162. The allegations in this section do not relate to any claim which does not require scienter.

## VI.    LOSS CAUSATION

163.    The Tribune Defendants' misrepresentations and omissions of material fact alleged above artificially inflated the price of Tribune stock during the Class Period.

164.    The artificial inflation created by the misrepresentations and omissions was removed from the prices of Tribune's common stock in direct response to information revealed in the July 16, 2018 disclosure alleged above, through which facts that corrected Defendants' prior misrepresentations and omissions of material fact were revealed and the risks concealed by such misrepresented and omitted material facts materialized.

165.    On July 16, 2018, FCC Chairman Ajit Pai issued a statement expressing "serious concerns about the Sinclair/Tribune transaction," in particular that "certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law."

166.    Later on July 16, Bloomberg, Reuters and other media outlets – and counsel for Tribune and Sinclair independently confirmed with FCC staff – that Chairman Pai had circulated to the other Commissioners a draft order asserting that Sinclair appeared to have engaged in misconduct relating to the Fader and Cunningham divestiture applications and that a majority of the Commissioners had already voted to refer the applications to an administrative law judge for review.

167.    As media outlets correctly reported and as analysts correctly explained, the FCC's statement indicated that any chance of receiving regulatory approval before the August 8, 2018 deadline was dead.

168.    The FCC's determination to refer Sinclair's proposed station divestitures to an administrative law judge, and the attendant failure of the Merger to obtain approval before the deadline, was the materialization of a previously undisclosed risk that Sinclair's obstruction and

-49-

inflexibility in its discussions with regulators would prevent the Merger from obtaining regulatory approval. Tribune has admitted in its verified complaint in the Delaware Merger Litigation that Sinclair's conduct before, and communications with, the DOJ delayed the FCC's review, and ultimately contributed to the failure of the Merger.

169.    Tribune stock closed at $32.12 per share on July 16, 2018, down more than 16% from $38.56 at close on the previous trading day and down more than 23% from its closing price on the day after Tribune's false and misleading March 1, 2018 Form 10-K ($42.06 per share).

170.    The Tribune Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members. Had the Tribune Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired Tribune common stock, or would not have purchased or otherwise acquired stock at the artificially inflated prices that they paid. It was also entirely foreseeable to the Tribune Defendants that misrepresenting and concealing these material facts would artificially inflate the price of Tribune stock and that the ultimate disclosure of this information, and/or the materialization of the risks concealed by the material misstatements and omissions, would cause the price of Tribune stock to decline.

171.    The economic loss, *i.e.* damages, suffered by Plaintiffs and other Class members directly resulted from Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's securities when the truth was revealed and/or the risks previously concealed by the Tribune Defendants' material misstatements and omissions materialized. As a result of the previously misrepresented and concealed material information and risks that were disclosed on July 16, 2018, and the corresponding substantial

-50-

decline in the price of Tribune stock as the market absorbed this information, Plaintiffs and other Class members have suffered economic loss.

172. The allegations in this section do not relate to any claim which does not require loss causation.

## VII. CLASS ACTION ALLEGATIONS

173. This class action is brought on behalf of all individuals and entities, except Defendants and their affiliates who purchased shares of Tribune stock during the November 29, 2017 through July 16, 2018 Class Period.

174. This class action is also brought on behalf of all individuals and entities, except Defendants and their affiliates, who purchased shares of Tribune stock contemporaneously with Oaktree's sales in the Oaktree Offering, or pursuant or traceable to the Oaktree Offering.

175. The Class is so numerous that joinder of all members is impracticable. As of the close of business on August 8, 2018, approximately 87.6 million shares of Tribune common stock were outstanding. Those shares were held by hundreds, if not thousands, of individuals and entities located throughout the country.

176. Questions of law and fact are common to the Class, including, among others, (i) whether certain Defendants violated the Exchange Act, (ii) whether certain Defendants violated the Securities Act; and (iii) whether and to what extent Defendants' conduct harmed Plaintiffs and other members of the Class.

177. There is a well-defined community of interests in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      (a)    Whether certain Defendants violated the Exchange Act;

      (b)    Whether certain Defendants violated the Securities Act;

(c)     Whether the Tribune Defendants misrepresented material facts;

(d)     Whether the Tribune Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     Whether the Tribune Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether the Tribune Defendants and the Director Defendants issued a false registration statement;

(g)     Whether Defendant Morgan Stanley sold Tribune stock pursuant to a false registration statement or prospectus;

(h)     Whether Defendant Oaktree sold Tribune Stock while in possession of material non-public information;

(i)     Whether Defendant Oaktree Capital controlled Defendant Oaktree;

(j)     Whether the prices of Tribune's securities were artificially inflated;

(k)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(l)     The extent of damage sustained by Class members and the appropriate measure of damages.

178.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

179.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

180.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR

181.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the Tribune Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Tribune who knew that the statement was false when made.

## IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

182. At all relevant times, the market for Tribune's common stock was efficient for the following reasons, among others:

    (a)    Tribune stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient and automated market;

    (b)    As a regulated issuer, Tribune filed periodic reports with the SEC and the NYSE;

    (c)    Tribune regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    (d)    Tribune was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

183.     As a result of the foregoing, the market for Tribune's common stock reasonably promptly digested current information regarding Tribune from all publicly available sources and reflected such information in the price of Tribune's common stock.  All purchasers of Tribune common stock during the Class Period suffered similar injury through their purchase of Tribune common stock at artificially inflated prices, and a presumption of reliance applies.

184.     A Class-wide presumption of reliance is also appropriate in this Action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

185.     The allegations in this section do not relate to any claim which does not require reliance.

## X.     CAUSES OF ACTION

### COUNT I:
### Against the Tribune Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

186.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

187.     During the Class Period, the Tribune Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Tribune securities at artificially inflated prices.

188.     The Tribune Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Tribune's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

189.     The Tribune Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Sinclair's unwillingness to make the station divestitures required to obtain regulatory approval for the Merger and the prospect that the Merger would therefore not be consummated.

190.     During the Class Period, the Tribune Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

191.     The Tribune Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  The Tribune Defendants engaged in this misconduct to conceal: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures and to support the artificially inflated prices of the Company's securities.

192.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tribune's securities.  Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been

aware that the market prices for Tribune's securities had been artificially inflated by the Tribune Defendants' fraudulent course of conduct.

193.    As a direct and proximate result of the Tribune Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered economic loss and damages, at an amount to be established at trial, in connection with their respective purchases of the Company's securities during the Class Period as the prior artificial inflation in the price of Tribune's securities was removed.

194.    By virtue of the foregoing, the Tribune Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT II:
### Against Oaktree for Violations of Section 20A of the Exchange Act

195.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

*1.    The Oaktree Defendants Possessed Material Non-Public Information About Sinclair's Breaching Conduct Related to the Merger at the Time of the Oaktree Offering*

196.    Oaktree, through Tribune's Board members Mr. Karsh and Defendant Jacobson, and through its historically close relationship with Tribune, possessed material nonpublic information at the time it sold shares in the Oaktree Offering.

197.    Beginning when Tribune emerged from bankruptcy, and continuing until at least November 29, 2017, the Oaktree Defendants received repeated updates on Tribune, including Merger-related information concerning Sinclair, Sinclair's continuing failure to cooperate with the FCC's required divestitures, and the DOJ's concerns related thereto, none of which provided a reasonable basis for Tribune's public assurances about Sinclair's cooperation with the Merger process.

198.    Specifically, Oaktree co-founder and then-President, Bruce Karsh served as Tribune's Chairman of the Board until October 26, 2017.  On October 31, 2017, Tribune announced that Mr. Karsh had resigned as Chairman of the Tribune Board effective October 26, 2017 in anticipation of the Merger. Specifically, Mr. Karsh stated that "[g]iven the overwhelmingly successful shareholder vote and the continued progress being made toward the company's merger with Sinclair Broadcast Group, now is the right time for me to step down from the Board."  Tribune further announced that in light of the pending Sinclair transaction, the Board decided not to name a new Chairman and would reduce the number of Board members.  However, Oaktree remained the largest shareholder of Tribune and Mr. Karsh's resignation does not indicate Oaktree or Mr. Karsh stopped receiving updates on the Merger and Sinclair's conduct, which was already under investigation by the DOJ in October 2017.

199.    To the contrary, among other things, following Mr. Karsh's October 2017 resignation, Director Defendant Jacobson remained on the Board, as he had been since 2012 and, beginning in October 2017, Defendant Jacobson served as a director of Oaktree Strategic Income Corporation and Oaktree Specialty Lending Corporation, both of which are specialty finance companies managed by Defendant Oaktree Capital.

200.    Oaktree has also made public statements related to its access and review of material non-public information related to their investments, such as Tribune:

> ***Oaktree may, from time to time, possess material non-public information, limiting our investment discretion.*** Oaktree and members of its investment teams may serve as directors of, or in a similar capacity with, companies in which we invest, the securities and obligations of which are purchased or sold on our behalf. In the event that material nonpublic information is obtained with respect to such companies, we could be prohibited for a period of time from purchasing or selling the securities or obligations of such companies

by law or otherwise, and this prohibition may have an adverse effect on us.[3]

201.    Throughout the Merger process, on information and belief, the Board, including Mr. Karsh and Defendant Jacobson received continued updates on the status of Sinclair's divestitures.

202.    These updates included, on information and belief, information related to (i) the DOJ's antitrust review beginning by August 2017, (ii) Sinclair's confrontational and belittling behavior toward the DOJ throughout that review, (iii) the DOJ's confirmation in early October that the DOJ was investigating all ten overlap markets, (iv) the DOJ's November 17, 2017 offer letter to Sinclair regarding its divestitures and (v) Sinclair's November 20, 2017 rejection of this offer.

203.    At the time of Oaktree Offering, Oaktree knew Sinclair had been confrontational and belittling toward the staff of the DOJ in response to an antitrust review process that had begun by August 2017, and that in early October 2017, the DOJ had reaffirmed that it was continuing to investigate whether Sinclair's proposal that it not divest stations in most of the agreed markets would violate antitrust regulations.  Oaktree further knew that on November 20, 2017, Sinclair had flatly refused to comply with a DOJ demand to divest stations in the agreed markets and that, consequently, the DOJ was escalating its investigation to include depositions of Tribune and Sinclair personnel.

### 2.    *Oaktree Sold Tribune Stock in the Oaktree Offering*

204.    Oaktree was prohibited from selling Tribune's common stock while in possession of such material nonpublic information, a prohibition it violated by selling millions of shares

---

[3] Oaktree Finance, LLC, Form N-2, dated May 11, 2011.

during the Oaktree Offering for almost $290 million at prices that later disclosures demonstrated to be inflated.

205. By reason of such conduct, Oaktree is liable under Section 20A of the Exchange Act to any Class member who purchased Tribune's common stock contemporaneously with sales by the Oaktree Defendants, including the First New York Funds, which purchased Tribune stock in the Oaktree Offering.

### 3. *Plaintiffs Purchased Tribune Stock Contemporaneously with Oaktree's Sales*

206. Contemporaneously with the Oaktree Defendants' sales from November 29, 2017 through December 4, 2017, the First New York Plaintiffs purchased shares of Tribune common stock. Upon information and belief, thousands of other Class Members also purchased shares contemporaneously with the Oaktree Defendants' November 29, 2017 through December 4, 2017 sales (in the Oaktree Offering). As alleged in this Complaint, at the time of Oaktree's sales and the First New York Plaintiffs' and other Class Members' purchases, the price of Tribune's common stock was inflated because Plaintiffs and the investing public did not know: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval, in direct violation of the Merger Agreement; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures, a position that the DOJ had already repeatedly rejected.

### 4. *Oaktree is Liable to Each Class Member Who Purchased Contemporaneously with Its Sales*

207. Section 20A of the Exchange Act provides that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation,

has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class."

208.    Oaktree sold Tribune stock in the Oaktree Offering while in possession of material non-public information including: (i) that Sinclair was not making the station divestitures required to obtain regulatory approval, in direct violation of the Merger Agreement; and (ii) that Sinclair was taking the position that it was not legally or contractually required to make such divestitures, a position that the DOJ had already repeatedly rejected.  Consequently, Oaktree is liable pursuant to Section 20A of the Exchange Act to any Plaintiff or Class member who purchased contemporaneously with the Oaktree Defendants' sales in the Oaktree Offering.

**COUNT III:**
**Against Oaktree Capital for Violations of Section 20(a) of the Exchange Act**

209.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

210.    Oaktree Capital acted as a controlling person of Oaktree within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

211.    Oaktree Capital controlled Oaktree as its ultimate parent and because its senior partners comprised the investment committee responsible for the disposition of Defendant Oaktree's Tribune shares.

212.    As set forth above, Oaktree violated Section 20A of the Exchange Act when it sold Tribune stock while in possession of material non-public information. By virtue of its status as the ultimate parent and ultimate controlling entity of Oaktree, Oaktree Capital had the power and the ability to control the actions of Oaktree.

213.    By reason of such conduct, Oaktree Capital is liable pursuant to Section 20(a) of the Exchange Act.

**COUNT IV:**
**Against the Tribune Defendants, the Director Defendants and Morgan Stanley For**
**Violations of Section 11 of the Securities Act**

214. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct by the Defendants to defraud Plaintiffs or other members of the Class. This Section 11 claim does not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, motive, scienter or intentional conduct as part of this claim, which does not have scienter or fraudulent intent as required elements. This count is predicated upon Defendants' liability for making untrue statements and omissions of material fact related to the Oaktree Offering in the Offering Materials.

215. This claim is brought against the Tribune Defendants, the Director Defendants, and Defendant Morgan Stanley pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all proposed Class members who purchased or otherwise acquired Tribune's common stock in or traceable to the Oaktree Offering.

216. At the time of the Oaktree Offering, the Offering Materials contained untrue statements of material fact, omitted to state facts necessary to make the statements made therein not misleading, and failed to disclose required material information, as set forth above.

217. Tribune is the issuer of the common stock sold pursuant to the Offering Materials. As the issuer of such stock, Tribune is strictly liable to Plaintiffs and the other members of the Class who purchased common stock in or traceable to the Oaktree Offering for the materially untrue statements and omissions that appeared in or were omitted from the Offering Materials.

218. The following Defendants were the signatories of the untrue and misleading November 29, 2017 Registration Statement and Prospectus as officers and directors of Tribune and are liable for the Oaktree Offering made pursuant to such Registration Statement and

Prospectus: Peter M. Kern, Chandler Bigelow, Craig A. Jacobson, Ross Levinsohn, Peter E. Murphy, and Laura R. Walker.

219. These Defendants are unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements. These Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement and Prospectus were true and not misleading, and that there were no omissions of any material fact.

220. The underwriter of the Oaktree Offering was Defendant Morgan Stanley.

221. Defendant Morgan Stanley is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Offering Materials. Defendant Morgan Stanley did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Materials were true and not misleading, and that there were no omissions of any material fact.

222. Plaintiffs and other members of the Class purchased Tribune common stock issued under or traceable to the Offering Materials.

223. Plaintiffs and other members of the Class did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained in the Offering Materials when they purchased or otherwise acquired the common stock of Tribune in or traceable to the Oaktree Offering.

224. Plaintiffs and other members of the Class who purchased the common stock pursuant to the Offering Materials suffered substantial damages as a result of the untrue statements and omissions of material facts in the Offering Materials, because they either sold these shares at

prices below the Offering prices or still held shares as of July 16, 2018, when the prices and trading value of the common stock were below the Offering prices and values.

225.    By reason of the foregoing, the Defendants named in this Count have violated Section 11 of the Securities Act.

### COUNT V:
### Against Morgan Stanley for Violations of Section 12(a)(2) of the Securities Act

226.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct by the Defendants to defraud Plaintiffs or members of the Class.  This Section 12 claim does not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, motive, scienter or intentional conduct as part of this claim, which does not have scienter or fraudulent intent as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct to defraud Plaintiffs or members of the class.  This count is predicated upon Morgan Stanley's liability as a statutory seller pursuant to the Offering Materials.

227.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Plaintiffs and all other members of the Class who purchased Tribune common stock in the Oaktree Offering, against Morgan Stanley.

228.    Morgan Stanley was a seller, offeror, and/or solicitor of sales of the common stock offered pursuant to the Offering Materials in or traceable to the Oaktree Offering.

229.    Morgan Stanley sold Tribune common stock pursuant to Offering Materials directly to Plaintiffs and other members of the Class.

230.     Morgan Stanley transferred title to Tribune stock to Plaintiffs and other members of the Class who purchased such stock in the Oaktree Offering, or transferred title of such Tribune Stock to other underwriters or broker-dealers that sold that stock.  Morgan Stanley also solicited the purchase of Tribune stock in the Oaktree Offering by Plaintiffs and other members of the Class who purchased in the Oaktree Offering by means of the Offering Materials, motivated at least in part by the desire to serve Morgan Stanley's own financial interests and the interests of Tribune and Oaktree, including but not limited to earning commissions on the sale of Tribune stock in the Oaktree Offering.

231.     The Offering Materials contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

232.     Plaintiffs and other members of the Class who purchased Tribune stock from Morgan Stanley and/or its duly authorized agents in the Oaktree Offering made such purchases pursuant to the materially untrue and misleading Offering Materials, and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

233.     Plaintiffs and other members of the Class who purchased the Tribune Stock in the Oaktree Offering from Morgan Stanley and/or its duly authorized agents pursuant to the Offering Materials suffered substantial damages as a result of the untrue statements and omissions of material facts therein, because they either sold these shares at prices below the offering prices or still held such securities as of the date of this Complaint, when the prices and trading value of the common stock were below the offering prices.

234. Plaintiffs and other members of the Class who purchased the Tribune common stock pursuant to the Offering Materials are entitled to damages from Morgan Stanley.

235. By virtue of the foregoing, Morgan Stanley violated Section 12(a)(2) of the Securities Act.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A. Determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Declaring that (i) the Tribune Defendants violated Section 10(b) of the Exchange Act as well as Rule 10b-5 promulgated thereunder, (ii) Oaktree violated Section 20A of the Exchange Act; (iii) Oaktree Capital violated Section 20(a) of the Exchange Act; (iv) the Tribune Defendants, the Director Defendants, and Morgan Stanley violated Section 11 of the Securities Act; and (v) Morgan Stanley violated Section 12(a)(2) of the Securities Act;

D. Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

## XII.   JURY DEMAND

Plaintiffs respectfully demand a trial by jury on all issues so triable.

DATED: January 31, 2019

Respectfully Submitted,

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle
**ENTWISTLE & CAPPUCCI LLP**
500 W. 2nd Street, Suite 1900-16
Austin, Texas 78701
Telephone: (512) 710-5960
Email:  aentwistle@entwistle-law.com

Michael H. Moirano
Claire G. Kenny
Stephen A. Gorman
**MOIRANO GORMAN KENNY, LLC**
135 S. LaSalle St., Suite 2200
Chicago, Illinois 60603
Telephone:  (312) 614-1260
mmoirano@mgklaw.com

*Counsel for Plaintiffs the Water Island*
*Funds and the First New York Funds*