# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THE ARBITRAGE EVENT-DRIVEN FUND, *et al.*, on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 18 C 6175 |
| | ) | |
| TRIBUNE MEDIA COMPANY, PETER M. KERN, CHANDLER BIGELOW, CRAIG A. JACOBSON, ROSS LEVINSOHN, PETER E. MURPHY, LAURA R. WALKER, OAKTREE TRIBUNE, L.P., OAKTREE CAPITAL MANAGEMENT, L.P., and MORGAN STANLEY & CO. LLC, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court are three separate motions to dismiss the Plaintiffs' amended class action complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on behalf of: (1) Defendants Tribune Media Company ("Tribune"), Peter Kern ("Kern"), and Chandler Bigelow ("Bigelow") (collectively, "the Tribune Defendants") and Craig A. Jacobson ("Jacobson"), Ross Levinsohn ("Levinsohn"), Peter E. Murphy ("Murphy"), and Laura R. Walker ("Walker") (collectively, "the Director Defendants"); (2) Defendants Oaktree Tribune, L.P. ("Oaktree") and Oaktree Capital Management, L.P. ("Oaktree Capital") (collectively, "the Oaktree Defendants"); and (3) Defendant

Morgan Stanley & Co., LLC ("Morgan Stanley") (collectively with the Tribune Defendants, the Director Defendants, and the Oaktree Defendants, "the Defendants"). For the following reasons, the Court grants the motions to dismiss with prejudice.

## BACKGROUND

For purposes of this opinion, the Court accepts as true the following facts from the amended complaint. *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995). All reasonable inferences are drawn in the Plaintiffs' favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

### *The Parties*

Plaintiff the Arbitrage Event-Driven Fund ("AEDF") is a fund series of a Delaware statutory trust that seeks capital growth through an opportunistic and flexible approach to event-driven investing. Plaintiff the Arbitrage Fund ("AF") (collectively, "Arbitrage") is a fund series of a Delaware statutory trust that seeks capital growth through an investment approach focused on the strategy of merger arbitrage.

Plaintiff the Water Island Merger Arbitrage Institutional Commingled Master Fund, LP ("the Water Island Fund") is a Cayman Islands limited partnership which invests in the equity and debt instruments of companies involved in corporate events. The Water Island Fund and its registered investment manager, Water Island Capital LLC ("Water Island Capital") (collectively, "Water Island") are headquartered in New York, New York.

Plaintiff First New York Partners Fund LP ("FNY Partners") is a Delaware limited partnership which invests in equity securities. Plaintiff FNY Managed Accounts, LLC ("FNY Managed") (collectively, "the FNY Funds") (collectively with Arbitrage and Water Island, "the Plaintiffs") is a Delaware limited liability company that also invests in equity securities. The FNY Funds and their registered investment manager, FNY Investment Advisers, LLC, are headquartered in New York, New York.

Defendant Tribune is a Delaware corporation headquartered in Chicago, Illinois. It is a media company with a diverse portfolio of television and digital properties, owning or operating 42 local television stations in 33 markets. Defendant Kern is a New York resident who served as the Chief Executive Officer of Tribune since March 2017 and on Tribune's Board of Directors since October 2016. Defendant Bigelow is an Illinois resident who served as Tribune's Chief Financial Officer and Executive Vice President since February 2016. Defendants Jacobson, Levinsohn, and Murphy are California residents who were members of Tribune's Board at all relevant times and remain directors of Tribune. Defendant Walker is a New York resident who was a member of Tribune's Board at all relevant times and remains a director of Tribune.

Defendant Oaktree is a Delaware limited partnership headquartered in Los Angeles, California. As of November 29, 2017, Oaktree was Tribune's largest shareholder, owning over 14 million shares of Tribune common stock. Oaktree's Tribune holdings were managed by an investment committee comprised of Oaktree Capital senior personnel, including Mr. Karsh ("Karsh") (Chairman of Tribune's Board

until October 2017 and Oaktree Capital co-founder), Howard S. Marks ("Marks") (co-founder), John B. Frank ("Frank") (Vice Chairman), David M. Kirchheimer ("Kirchherimer") (Advisory Partner and former Principal and Chief Financial Officer), and Stephen A. Kaplan ("Kaplan") (Advisory Partner and former head of Oaktree's Global Principal Group).

Defendant Oaktree Capital is a leading global alternative investment management firm headquartered in Los Angeles, California. Oaktree Capital is the parent company of Oaktree and was the controlling entity of Oaktree with respect to their Tribune shares. As of December 31, 2017, Oaktree Capital reported sole voting power and sole dispositive power with respect to Oaktree's Tribune shares. Defendant Jacobson served as a director of two unrelated specialty finance companies managed by Oaktree Capital.

Defendant Morgan Stanley is a Delaware limited liability company headquartered in New York, New York.

***Tribune Background***

Founded in 1847, the original Tribune Company was the publisher of the Chicago Daily Tribune. However, in 2008, the company filed for Chapter 11 bankruptcy. On December 31, 2012, Tribune emerged from bankruptcy as a newly-reorganized company. Pursuant to Tribune's confirmed joint plan of reorganization proposed by its committee of unsecured creditors, its largest creditors, including Oaktree Capital, assumed control of the company.

As Tribune's largest shareholder at 22 percent, Oaktree Capital was entitled to appoint two board members. On January 17, 2013, Karsh was named Chairman of Tribune's Board. At the time, Karsh was also acting as Oaktree Capital's Co-Chairman, Chief Investment Officer, and a member of the investment committee that controlled the disposition of Oaktree's Tribune stock.

In July 2013, Tribune announced plans to split into two companies, with Tribune focusing on broadcasting and a new company, Tribune Publishing, focusing on print. On August 4, 2014, Tribune completed the split, with Oaktree owning 18.5 percent of Tribune Publishing and 18.5 percent of Tribune. By March 2017, Oaktree owned 16.3 percent of Tribune.

### The Merger with Sinclair

On February 29, 2016, Tribune announced that they were exploring the option of a merger or sale of the company. Due to investors' positive reaction to the news, Tribune's share price rose 9 percent, closing at $35.90 per share—up from $32.95 at close the previous day. Tribune's share price rose again the following day, closing at $37.91 on March 1, 2016.

By November 2016, Tribune was in serious negotiations with Sinclair Broadcasting Group, Inc. ("Sinclair") regarding a merger. On March 1, 2017, Reuters reported that Sinclair executives approached Tribune about a possible acquisition. Investors again responded positively, and Tribune stock rose 8 percent from $34.52 to $37.38.

On May 8, 2017, Tribune announced that it had entered into a Merger Agreement with Sinclair, pursuant to which Sinclair would acquire Tribune's outstanding stock, and Tribune shareholders would receive cash plus Sinclair stock for a total of $43.50 per share. Investors reacted positively to the news, and Tribune's stock closed at $42.40 per share.

***Pre-Class Period[1] Merger Developments***

Combining Tribune and Sinclair would trigger regulatory scrutiny by both the U.S. Department of Justice ("DOJ") and the Federal Communications Commission ("FCC"). To allay investor concerns over such scrutiny, Tribune issued a press release on May 8, 2017, saying, "In order to comply with FCC ownership requirements and antitrust regulations, Sinclair may sell certain stations in markets where it currently owns stations. Such divestitures will be determined through the regulatory approval process."

The following day, Tribune publicly filed its Form 8-K announcing the Merger Agreement with the U.S. Securities and Exchange Commission ("SEC"). The Form 8-K attaches Tribune's May 8, 2017 press release and the Merger Agreement as exhibits. The Merger Agreement contained the following provisions related to Sinclair's station divestitures:

> [Sinclair] shall use reasonable best efforts to take action to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably

---

[1] The Class Period spans from November 29, 2017 through July 16, 2018.

practicable, including … the proffer and agreement by [Sinclair] of its willingness to sell, lease, license or otherwise dispose of, or hold separate pending such disposition, and promptly to effect the sale, lease, license, disposal and holding separate of, such assets, rights, product lines, categories of assets or businesses or other operations or interest therein of [Sinclair] or any of its Subsidiaries [ ] (hereinafter referred to as the "Station Divestitures") and … the proffer and agreement by [Sinclair] of its willingness to take such other actions, and promptly to effect such other actions (and the entry into agreements with, and submission to orders of, the relevant Governmental Authority giving effect thereto, including the entry into hold separate arrangements, terminating, assigning or modifying Contracts (or portions thereof) or other business relationships, accepting restrictions on business operations and entering into commitments and obligations) (each an "Approval Action").

Tribune reiterated this message in its September 2017 Proxy, noting that Sinclair had agreed to divest one or more stations in ten specific overlap markets.

In September 2017, DOJ Assistant Attorney General in charge of Antitrust, Mark Delrahim ("AAG Delrahim"), took office.  AAG Delrahim made clear that he was focused on divestitures in the ten identified overlap markets and that Sinclair's agreement to divestitures in those markets would halt DOJ's investigation of the merger.  Sinclair, however, attempted to persuade DOJ that divestitures in most of the ten overlap markets should not be required to approve the merger.

On November 17, 2017, DOJ staff sent Sinclair a letter stating that none of its arguments had persuaded them as to any of the overlap markets.  That same day, AAG Delrahim called Sinclair's antitrust counsel and Tribune's regulatory counsel to convey that DOJ's concerns with the merger could be resolved if Sinclair agreed to divest stations in eight to ten of the overlap markets.  The Plaintiffs allege that Sinclair

effectively rejected this offer by November 20, 2017 because DOJ would not pause its investigatory depositions scheduled for that week; however, the Defendants note that Sinclair did not reject the offer until December 15, 2017.[2]  In a December 18, 2017 letter from Tribune's general counsel to Sinclair's general counsel, Tribune informed Sinclair that it considered Sinclair's rejection of DOJ's offer to be inconsistent with its obligations under the Merger Agreement.  Defendant Kern was copied on that letter.

### The Oaktree Offering

On November 29, 2017, Tribune announced that Oaktree would be selling seven million of its shares.  Pursuant to the Offering Materials, Oaktree would sell each share at $40.36 to underwriter Morgan Stanley.  The Offering Materials authorized Morgan Stanley to offer those shares to the public, which they did for $40.76 per share over the next several trading days.

In the Registration Statement and Prospectus for the Oaktree Offering, Tribune repeated the substance of its previous statements on the merger and did not disclose that Sinclair was not agreeing to DOJ's request to divest eight to ten of its stations in overlapping markets.  The Registration Statement and Prospectus included the warnings that "[f]ailure to obtain the necessary governmental approvals and consents would prevent the parties from consummating the proposed Merger," and that:

---

[2] "In considering a motion to dismiss under Rule 12(b)(6), district courts are free to consider any facts set forth in the complaint that undermine the plaintiff's claim.  The freedom includes exhibits attached to the complaint or documents referenced in the pleading if they are central to the claim." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).  In the event that an exhibit "contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Id.*

There can be no assurance that the actions Sinclair is required to take under the Merger Agreement to obtain the governmental approvals and consents necessary to complete the Merger will be sufficient to obtain such approvals and consents or that the divestitures contemplated by the Merger Agreement to obtain necessary governmental approvals and consents will be completed.

Finally, the Registration Statement and Prospectus stated that Tribune anticipated the merger would close in the first quarter of fiscal 2018. The Oaktree Offering closed on December 4, 2017. During the class period, the Plaintiffs purchased shares of Tribune common stock.

*Regulatory Developments During Class Period*

On January 24, 2018, Kern sent an e-mail to Sinclair's CEO, urging Sinclair to comply with its obligations under the Merger Agreement given that they were slated to have their final front office meeting with DOJ the following day. At the conclusion of this meeting, DOJ typically concludes its investigation and decides whether to sue. In relevant part, Kern wrote:

While I know you are well aware of our position and your contractual obligations, and at the risk of belaboring the point – in the event DOJ offers to end its investigation if Sinclair agrees to divest stations within the ten overlap [markets] spelled out in the merger agreement, you are contractually bound to accept.

Sinclair's CEO responded that day, writing, "Although I do not think it is productive to engage in a legal debate with you, for the record I am writing to advise you that we disagree with the legal conclusion stated in your email as to Sinclair's contractual obligations."

At the January 25, 2018 meeting with DOJ, Tribune, and Sinclair, DOJ offered to end its investigation upon Sinclair's agreement to divest its stations in the ten overlap markets. Sinclair countered by offering sales in four of the overlap markets, which DOJ rejected. Sinclair then declared that it intended to litigate with DOJ, with Sinclair's general counsel telling AAG Delrahim, "sue me." However, after Tribune threatened to sue Sinclair for breaching its contractual obligations, Sinclair altered its position and agreed on February 14, 2018 to offer the divestitures demanded by DOJ.

Sinclair acted with similar opposition in its dealings with the FCC. On February 27, 2017, Sinclair proposed station sales to parties with ties to Sinclair's Executive Chairman, David Smith ("Smith") and his family, coupled with joint sales and shared services agreements under which Sinclair would effectively control all aspects of station operations. Under these proposed arrangements, Sinclair would continue to reap the lion's share of the economic benefits of the stations it was purportedly "divesting" and would have the option to repurchase the stations in the future. Tribune warned Sinclair that proposing these related-party sales was incompatible with using best efforts to obtain prompt regulatory approval.

After reviewing Sinclair's proposal, the FCC expressed frustration over what they viewed as unacceptably aggressive terms for Sinclair's proposed divestitures. The FCC advised Sinclair to propose "clean" divestitures, meaning arm's length sales to independent third parties.

On March 1, 2018, Tribune filed its Form 10-K, updating its projection that they "currently anticipate the Merger will close in the second quarter of fiscal 2018." The form also repeated the obligations under the Merger Agreement and a recitation of risk factors related to the Merger Agreement. The filing did not mention any obstructive behavior by Sinclair related to DOJ or FCC approvals. On March 2, 2018, Tribune stock closed at $42.06 per share.

On May 10, 2018, Tribune filed its Form 10-Q for the second quarter of 2018. Like its prior filings, the Form provided detail concerning the purported progress of regulatory approval for the Merger. Specifically, the Form noted:

> On April 24, 2018, the parties jointly filed (1) an amendment to the Applications [  ] that superseded all prior amendments and … provided additional information regarding station divestitures proposed to be made by Sinclair in 15 television markets in order to comply with the Duopoly Rule or the National Television Multiple Ownership Rule, (2) a letter withdrawing the Divestiture Trust Applications and (3) a letter withdrawing the application for approval of the sale of WPIX-TV to a third-party purchaser. In order to facilitate certain compliance divestitures described in the April 24 Amendment, between April 24, 2018 and April 30, 2018, Sinclair filed applications seeking FCC consent to the assignment of license or transfer of control of certain stations in 11 television markets.

Similar to the March filing, this Form did not mention any obstructive behavior by Sinclair related to DOJ or FCC approvals.

***Merger Breakdown***

On July 16, 2018, FCC Chairman Ajit Pai ("Chairman Pai") issued a statement, saying:

Based on a thorough review of the record, I have serious concerns about the Sinclair/Tribune transaction. The evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law. When the FCC confronts disputed issues like these, the Communications Act does not allow it to approve a transaction. Instead, the law requires the FCC to designate the transaction for a hearing in order to get to the bottom of those disputed issues. For these reasons, I have shared with my colleagues a draft order that would designate issues involving certain proposed divestitures for a hearing in front of an administrative law judge.

By the close of trading on July 16, 2018, Tribune's stock price had fallen 16 percent, or $6.44 per share, wiping out more than $564 million in market capitalization.

In a press release the following day, Tribune addressed Chairman Pai's statement, saying:

Tribune Media was disappointed to learn that the Chairman had circulated an order designating certain issues for consideration by an Administrative Law Judge. It will review the FCC's hearing designation order when released and expects to work with the FCC to explore ways to address the concerns identified. Until we have reviewed the order it is difficult to explain the potential issues it might create for the transaction.

On August 9, 2018, Tribune issued a press release announcing that it was abandoning the merger and disclosing Sinclair's refusal to divest stations to achieve regulatory approval:

In the Merger Agreement, Sinclair committed to use its reasonable best efforts to obtain regulatory approval as promptly as possible, including agreeing in advance to divest stations in certain markets as necessary or advisable for regulatory approval. Instead, in an effort to maintain control over stations it was obligated to sell, Sinclair engaged in unnecessarily aggressive and protracted negotiations with the [DOJ] and the [FCC] over regulatory requirements, refused to sell stations in the markets as required to obtain approval, and proposed aggressive divestiture structures and

related-party sales that were either rejected outright or posed a high risk of rejection and delay—all in derogation of Sinclair's contractual obligations. Ultimately, the FCC concluded unanimously that Sinclair may have misrepresented or omitted material facts in its applications in order to circumvent the FCC's ownership rules and, accordingly, put the merger on indefinite hold while an administrative law judge determines whether Sinclair mislead the FCC or acted with a lack of candor.

The same day, Tribune filed an action in Delaware,[3] alleging a breach of contract claim against Sinclair.

Based on these events, the Plaintiffs filed the amended complaint on January 31, 2019, alleging securities fraud violations under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("the Exchange Act") and Sections 11 and 12(a)(2) of the Securities Act of 1933 ("the Securities Act"). The Defendants filed three separate motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on March 29, 2019.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The Plaintiffs need not provide detailed factual allegations, but they must provide enough factual support to raise their right to relief above a speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim must be facially plausible, meaning that the pleadings must "allow…the court to draw the reasonable inference that the defendant is liable for the

---

[3] *Tribune Media Co. v. Sinclair Broadcast Group, Inc.*, C.A. No. 2018-0593-JTL (Del. Ch.).

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 77z-1 and 78u-4, instructs courts to apply a more rigorous version of the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) to securities fraud actions. *Cornielsen v. Infinium Capital Mgmt, LLC*, 916 F.3d 589, 598 (7th Cir. 2019). Rule 9(b) "provides that a party alleging fraud or mistake must state with particularity the circumstances constituting fraud or mistake…." *Id.* (internal quotation omitted). Generally, this means that a plaintiff must describe the "who, what, when, where, and how" of the fraud. *Id.* The PSLRA goes a step further and "requires plaintiffs to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Alizadeh v. Tellabs, Inc.*, 2015 WL 557249, *6 (N.D. Ill. 2015). Courts apply this heightened standard "to discourage a 'sue first, ask questions later' philosophy." *Cornielsen*, 916 F.3d at 598 (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011)).

## DISCUSSION

**I. The Tribune and Director Defendants' Motion to Dismiss**

The Plaintiffs assert that the Tribune and Director Defendants violated Section 10(b) of the Exchange Act (Count I) and Section 11 of the Securities Act (Count IV). To state a claim under Section 10(b), the Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Cornielsen*, 916 F.3d at 598. To state a claim under Section 11, "plaintiffs must allege that defendants made untrue statements of material fact or omitted material facts in a registration statement or prospectus," thereby making the disclosure misleading. *Miller v. Apropos Tech., Inc.*, 2003 WL 1733558, *4 (N.D. Ill. 2003).

The Tribune and Director Defendants urge the Court to dismiss Counts I and IV of the amended complaint for three reasons: (1) the Plaintiffs plead no actionable misrepresentations; (2) the Plaintiffs do not allege facts that give rise to a strong inference of scienter; and (3) the Plaintiffs fail to plead loss causation. Morgan Stanley joins in these arguments with respect to Count IV. The Court addresses each argument in turn.

### A. Actionable Misrepresentations

The Tribune and Director Defendants argue that the Plaintiffs failed to state a securities fraud claim because the allegations are based on descriptions of the Merger

Agreement and forward-looking statements, neither of which are actionable.

Turning first to the descriptions of the Merger Agreement, the Tribune and Director Defendants contend that their statements were "accurate statements of historical fact," and as such "are not actionable." *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001). However, the Plaintiffs maintain that, "Some statements, although literally accurate, can become through their context and manner of presentation, devices which mislead investors…." *In re Next Level Systems, Inc.*, 1999 WL 387446, *7 (N.D. Ill. 1999). The Plaintiffs say that these descriptions were false and misleading because they concealed Sinclair's reluctance to divest stations in overlapping markets. The Court disagrees.

The context of the statements makes clear that the description is only intended to be a summary of the Merger Agreement, nothing more. Accompanying the description were cautionary statements that the description "does not purport to be complete and is subject to, and qualified in its entirety by, the full text of the Merger Agreement" and "should not be relied on as [a characterization] of the actual state of facts about Tribune or Sinclair." The plain language of these statements makes clear that the description makes no evaluation of the parties' intentions or actions regarding those obligations. Accordingly, these statements are true and cannot serve as the basis for a securities fraud claim.

Turning next to the forward-looking statements predicting when the merger would close, the Tribune and Director Defendants maintain that these statements are

protected by the PSLRA's Safe Harbor provision. That statute says that a forward-looking statement "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" is not actionable. 15 U.S.C. § 78u-5(c)(1). The Seventh Circuit has clarified that the "PSLRA does not require the *most* helpful caution; …it is enough to point to the principal contingencies that could cause actual results to depart from the projection." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (emphasis in original); *See also Silverman v. Motorola, Inc.*, 2008 WL 4360648, *12 (N.D. Ill. 2008) ("[The PSLRA] does not require that defendant list *every* factor, and that failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor.") (emphasis in original).

Tribune's predictions regarding the merger's closing date satisfy both conditions for protection under the Safe Harbor provision. First, the statements are forward looking in that they predict future activity, namely the closing date of the merger. Second, the statements were accompanied by the following cautionary language:

- [I]t cannot be certain when or if the conditions for the Merger will be satisfied or waived;

- The Merger is subject to a number of conditions, including conditions that may not be satisfied or completed on a timely basis, if at all;

- There can be no assurance that the actions Sinclair is required to take under the Merger Agreement to obtain the governmental

approvals and consents necessary to complete the Merger will be sufficient to obtain such approvals and consents or that the divestitures contemplated by the Merger Agreement to obtain necessary governmental approvals and consents will be completed; and

- Failure to obtain the necessary governmental approvals and consents would prevent the parties from consummating the proposed Merger.

This language specifically warns investors of the conditions in the Merger Agreement and the need for governmental approval of the merger. It also notes that failure to obtain said governmental approval would prevent the merger from closing. Therefore, this language surpasses the boilerplate level and constitutes a meaningful cautionary statement. Accordingly, the PSLRA's Safe Harbor provision shields these statements from liability.

The Plaintiffs attempt to bring this statement out from under the protection of the Safe Harbor provision by arguing that the cautionary language was not meaningful, as it disclosed a risk that already materialized. While it is true that "Defendants cannot seek safe harbor refuge by representing a risk that already has materialized…as a risk that could develop in the future," that is not the case here. *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 949 (N.D. Ill. 2015); *See also Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011) ("[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

At the time of Tribune's statements, the risk that the parties would not obtain governmental approval and satisfy the conditions of the Merger Agreement had not materialized. Sinclair was in negotiations with DOJ regarding station divestitures until December 15, 2017, when it rejected DOJ's offer to divest eight to ten stations. Therefore, at the time of Tribune's first prediction on November 29, 2017, no risk had materialized. Similarly, Sinclair revived negotiations with DOJ by mid-February 2018. Therefore, at the time of Tribune's second prediction on March 1, 2018, no risk had materialized either. This is not the typical situation where a risk had already materialized in the form of lost revenue. *See In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 985 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("…Facebook's Registration Statement did not disclose that increased mobile usage and the Company's product decisions had already had a negative impact on the Company's revenues and revenue growth. The Company's purported risk warnings misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized."). Rather, Tribune was actively in negotiations to obtain regulatory approval at the time of the predictions. Even if those negotiations faced some speedbumps, no risk of merger failure had materialized at the time of Tribune's predictions. Accordingly, the Court finds that the PSLRA's Safe Harbor provision applies.

**B. Scienter**

"Because the Court has already found that Plaintiffs failed to adequately allege any material misstatements, the Court need not determine whether Plaintiffs satisfy the

PSLRA's scienter requirement. Nonetheless, for the sake of completeness, the Court will address the scienter element." *Alizadeh v. Tellabs, Inc.*, 2015 WL 557248, \*15 (N.D. Ill. 2015).

"Under the PSLRA's 'strong inference' standard, '[a] complaint will survive… only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Cornielsen*, 916 F.3d at 601 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). In conducting this analysis, "the court must take into account plausible opposing inferences." *Tellabs, Inc.*, 551 U.S. at 323. "[B]ecause Plaintiffs failed to demonstrate that any of the Defendants' material statements were false or misleading, they also cannot establish scienter. … But even if Plaintiffs had adequately alleged misleading material statements, their deficient allegations of scienter would independently doom the [complaint]." *Alizadeh*, 2015 WL 557248, \*15.

Regarding Tribune's descriptions of the Merger Agreement, the Plaintiffs only allegations concerning scienter point to Sinclair's ongoing struggle with DOJ and the FCC regarding station divestitures. However, as noted above, those allegations merely say that Tribune knew of the negotiations and was actively encouraging Sinclair to comply with the regulatory process. The allegations do not give rise to a cogent and compelling inference that Tribune knew the merger would fail or that Sinclair had breached its contractual obligations. Neither of those things came to pass until after Tribune had made its allegedly false or misleading statements. The same rationale

applies to Tribune's forward-looking statements, which require actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1)(B). If the Plaintiffs' allegations do not give rise to the inference of knowledge, they certainly do not give rise to actual knowledge of falsity.

The Plaintiffs also attempt to plead scienter based on motive. The Plaintiffs assert that the Tribune and Director Defendants were motivated to conceal Sinclair's conduct in the negotiations process to artificially inflate the price of its stock. Moreover, the Plaintiffs maintain that Kern and Bigelow were the CEO and CFO of Tribune; were the corporate representatives that signed the Registration Statement and Prospectus, the March 2018 Form 10-K, and the May 2018 Form 10-Q; and were included on communications with Sinclair and the governmental entities. However, these allegations also do not salvage the amended complaint.

First, this Court has rejected the contention that a company's desire to increase the value of their stock is evidence of fraud, holding:

> The desire to increase the value of a company and attain the benefits that result, such as meeting analyst expectations and reaping higher compensation, are basic motivations not only of fraud, but of running a successful corporation. Were courts to accept these motives as sufficient to establish scienter, most corporate executives would be subject to such allegations, and the heightened pleading requirements for these claims would be meaningless.

*Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 714 (N.D. Ill. 2005). Moreover, the Seventh Circuit held that an executive's "motive to pretend nothing was amiss" was insufficient to establish scienter, finding that "a generalized motive common to all corporate

executives is not enough to establish scienter." *Pension Trust Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939–40 (7th Cir. 2018).

Second, and relatedly, allegations that Kern and Bigelow were Tribune's CEO and CFO are insufficient to establish scienter under the PSLRA. This Court has found that "a pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Davis*, 385 F. Supp. 2d at 713–714. "Indeed, respective positions within a company prove nothing about fraud or knowledge thereof but rather are exactly the type of generalized allegations the court must disregard under the PSLRA." *Plumbers and Pipefitters Local Union v. Zimmer*, 673 F. Supp. 2d 718, 746–47 (S.D. Ind. 2009) (internal quotation omitted). Accordingly, the Court cannot find scienter based on these facts.

Third, it is not enough to have access to false information; a defendant must have knowledge that the information is false. As the Seventh Circuit has held, "a complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information." *Cornielsen*, 916 F.3d at 602 (quoting *Pugh v. Tribune Co.*, 521 F.3d 686, 694 (7th Cir. 2008) ("[T]here is a big difference between knowing about…reports from [a subsidiary] and knowing that the reports are false.")); *See also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) (same).

Finally, the Court finds that the opposing inference from this information is stronger than the Plaintiff's conclusion of fraud. In *City of Livonia Employees'*

*Retirement System and Local 295/Local 851 v. Boeing Company*, the Seventh Circuit

addressed competing inferences based on Boeing's continued projections for the First

Flight of its 787-8 Dreamliner. 711 F.3d 754, 757 (7th Cir. 2013). Despite several

failed tests from April to May of 2009, Boeing continued to opine the Dreamliner would

have its first flight in June 2009. *Id.* However, on June 23, 2009, Boeing cancelled the

Dreamliner's first flight due to an "anomaly" revealed in the testing. *Id.* Boeing stated

that they "hoped to be able to solve the problem in time for a First Flight in June, but

had been unable to do so." *Id.* Based on these facts, the Seventh Circuit held:

> A more plausible inference than that of fraud is that the defendants, unsure
> whether they could fix the problem by the end of June, were reluctant to
> tell the world "we have a problem and maybe it will cause us to delay the
> First Flight and maybe not, but we're working on the problem and we
> hope we can fix it in time to prevent any significant delay, but we can't be
> sure, so stay tuned." There is a difference, famously emphasized by Kant,
> between a duty of truthfulness and a duty of candor, or between a lie and
> reticence. There is no duty of total corporate transparency—no rule that
> every hitch or glitch, every pratfall, in a company's operations must be
> disclosed in "real time," forming a running commentary, a baring of the
> corporate innards, day and night.

*Id.* at 758–59. The Court finds that the same is true here—the more plausible inference

is that the Tribune and Director Defendants were attempting to ease the regulatory

issues that arose with Sinclair with the aim of closing the merger. The fact that Tribune

continued to see the regulatory process through cuts against the inference of scienter

and weighs in favor of their good faith belief that the merger would be approved. *See*

*Emps. Ret. Sys. of Rhode Island v. Williams Cos., Inc.*, 889 F.3d 1153, 1173 (10th Cir.

2013) ("Indeed, if [Defendants] thought there was a substantial likelihood that the WPZ

merger would not go through, what would be its motive to press forward on the transaction?").  Accordingly, the Court finds that the Plaintiffs have not sufficiently plead scienter.

### C. Loss Causation

Finally, the Tribune and Director Defendants contend that the Plaintiffs fail to plead loss causation.  To satisfy this requirement, "there must be a causal connection between the material misrepresentation and the loss, not simply that the misrepresentation touches upon a later economic loss." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007).  The Tribune and Director Defendants maintain that Chairman Pai's statement expressing concerns over undisclosed entanglements between Sinclair and their proposed divestiture partners, which caused Tribune's stock to decline, had no relation to the allegations regarding Tribune's allegedly false or misleading statements.  With respect to any allegations regarding Sinclair's obstinance in DOJ negotiations, those facts cannot satisfy the loss causation requirement because they concern a separate regulatory process.  Regarding the FCC allegations, there are no allegations that Tribune knew about Sinclair's entanglements, as those only came to light in the public comment period that took place after Tribune's allegedly false or misleading statements.  Although the corrective statement need not be a direct contradiction of a previous statement, the allegations must demonstrate how the misrepresentation at issue caused the economic loss.  The Plaintiffs have failed to do that here.

Given that the Plaintiffs have failed to plead an actionable misstatement, scienter, or loss causation, the Court grants the motion to dismiss Counts I and IV as to both the Tribune and Director Defendants and Morgan Stanley.

## II. The Oaktree Defendants' Motion to Dismiss

The Plaintiffs next assert that the Oaktree Defendants violated Sections 20A (Count II) and 20(a) (Count III) of the Exchange Act. Section 20A provides a derivative cause of action for an underlying insider trading violation while in possession of material, nonpublic information. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 2008 WL 2178150, *2 (N.D. Ill. 2008). Therefore, the Plaintiffs must plead a primary offense— here under Section 10(b)—to state a claim for a predicate offense under Section 20A. Section 20(a) holds "controlling persons" liable for the actions of the controlled entity. *Pugh*, 521 F.3d at 693. Therefore, to state a claim under Section 20(a), "a plaintiff must first adequately plead a primary violation of securities laws." *Id.*

The Oaktree Defendants move the Court to dismiss Counts II and III of the amended complaint because the Plaintiffs fail to plead: (1) that Oaktree was in possession of material non-public information ("MNPI"); (2) that Oaktree had a fiduciary duty or breached that duty; (3) that Oaktree possessed the requisite scienter; or (4) that Oaktree's alleged insider trading caused the Plaintiffs' losses. The Court addresses each argument in turn.

**A. Oaktree's Possession of MNPI**

The Court begins by considering the sufficiency of the allegations that Oaktree was in possession of MNPI at the time of the Oaktree Offering. The relevant MNPI alleged in the amended complaint concerns Sinclair's refusal to make station divestitures and its related obstinance in negotiations with DOJ. For several reasons, Oaktree could not have that MNPI, and the Plaintiffs could not allege that Oaktree did.

First, at the time of the Oaktree Offering from November 29, 2017 until December 4, 2017, the MNPI did not exist. While Sinclair's negotiations with DOJ were already underway at the time of the sale, Sinclair did not issue a rejection to DOJ until December 15, 2017—well after the Oaktree Offering period ended. Accordingly, Oaktree could not have known that Sinclair would reject DOJ's divestiture offer, as that had not yet occurred.

Even assuming the MNPI existed at the time of the Oaktree Offering, the Plaintiffs' allegations are still insufficient. They allege that "Oaktree, through Tribune's Board members Mr. Karsh and Defendant Jacobson, and through its historically close relationship with Tribune, possessed material nonpublic information at the time it sold shares in the Oaktree Offering." Regarding Karsh, he was the co-founder of Oaktree Capital and served as the Chairman of Tribune's Board until October 31, 2017. The Plaintiffs attempt to get around the fact that Karsh resigned well before the Oaktree Offering by alleging on information and belief that he "received continued updates on the status of Sinclair's divestitures." However, this type of

"speculation does not satisfy the requirement of Fed. R. Civ. P. 9(b)," let alone the heightened standard under the PSLRA. *LHLC Corp. v. Cluett, Peabody & Co., Inc.*, 842 F.2d 928, 933 (7th Cir. 1988). The same is true for Defendant Jacobson, as the Plaintiffs only allege his position with two unrelated Oaktree entities, but assert no other facts regarding his possession or communication of MNPI to Oaktree.

Moreover, a historically close relationship or a position on the Board is not sufficient to allege the possession of MNPI. This Court previously held allegations that a defendant "knew or should have known" about MNPI do not pass muster to plead an insider trading claim. *Abrams v. Prudential Secs., Inc.*, 2000 WL 390494, *4 (N.D. Ill. 2000). Similarly, the Court in *Shah v. Zimmer Biomet Holdings, Inc.* found that a person's position on the Board of Directors was not sufficient to prove that person possessed MNPI. 348 F. Supp. 3d 821, 849 (N.D. Ind. 2018). Rather, the Court held that those allegations said "nothing more than that the [defendants] had *potential* access to insider information. But access to information is not the same as actually possessing the specific information and knowing it." *Id.* (internal quotation omitted) (emphasis in original). Applying this rationale here, the Plaintiffs need to allege more than just Karsh and Jacobson's relationships with Tribune and Oaktree—they need to allege possession of MNPI. However, they failed to do so here.

### B. Fiduciary Duty and Breach

To state a claim for insider trading, a person must breach "a fiduciary duty or other duty arising out of a relationship of trust and confidence." *SEC v. Steffes*, 805 F.

Supp. 2d 601, 608 (N.D. Ill. 2011).   Under the classical theory of insider trading, a person can only be liable if they are "an insider of the corporation whose securities are traded."  *Id.* at 609.

Oaktree maintains that it was not an insider of Tribune because it was only a minority shareholder, and thus, owed no fiduciary duty to Tribune.  The Court agrees. Both state and federal courts have held that minority shareholders do not acquire insider status, even if they have a member on the Board, unless they exercise control over the corporation's affairs.  *Jensen v. Oliver*, 1998 WL 673829, *5 (N.D. Ill. 1998) ("Only a majority or controlling shareholder, and not a minority shareholder, holds…a fiduciary duty."); *Sawant v. Ramsey*, 742 F. Supp. 2d 219, 238 (D. Conn. 2010) (rejecting "insider" theory as to a major shareholder because he was "not a professional advisor or consultant, and was not employed…as such"); *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086, at *20 n.18 (Del. Ch. 1996) (rejecting theory that an entity became an "insider" because one of their controlling partners was a member of the Board of Directors); *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994) ("[A] shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status.").  Because the Plaintiffs fail to establish that Oaktree was an insider who owed a fiduciary duty to Tribune, their insider trading claim cannot proceed.

## C. Scienter

Given the Plaintiffs' failure to allege that Oaktree possessed MNPI, they also cannot sufficiently allege that Oaktree possessed the requisite scienter while in possession of MNPI. Barring these deficiencies, Oaktree maintains that the amended complaint insufficiently pleads scienter. Because the Court recognizes the merits of the parties' countervailing positions[4] and the strength of the divergent legal authority on these positions, we decline to decide the scienter hypothetical before us. *See Carpenters Pension Trust Fund for N. Calif. v. Allstate Corp.*, 2018 WL 1071442, *5 (N.D. Ill. 2018); *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2012 WL 1068761, *13 (N.D. Ill. 2012); *In re Cobalt Int'l Energy, Inc. Sec. Lit.*, 2017 WL 2599327, *7 (S.D. Tex. 2017). Rather, we find that the Plaintiffs did not sufficiently plead Oaktree's scienter while in possession of MNPI given that they have not plead the underlying possession of MNPI.

## D. Loss Causation

Finally, the Court turns to the issue of loss causation. According to the PSLRA, "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused

---

[4] The Plaintiffs allege circumstantial evidence to establish scienter, including that Oaktree engaged in an unusually large offering of nearly half of its Tribune stock close in time to Sinclair's obstinate behavior toward DOJ. Moreover, if Oaktree had waited to sell its shares, it stood to gain an additional $22 million. Oaktree counters that it retained more than half of its Tribune stock, sales of large quantities of stock were not unusual for Oaktree, and roughly nine months passed from the Oaktree Offering to the negative disclosure—which they claim negates the inference of scienter. Further, Oaktree asserts that its decision to sell its Tribune stock was sensible because they would receive $40.36 in cash under the Offering Materials, as opposed to the $35.00 cash plus Sinclair stock under the Merger Agreement.

the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). As noted above, "there must be a causal connection between the material misrepresentation and the loss, not simply that the misrepresentation touches upon a later economic loss." *Tricontinental*, 475 F.3d at 843.

The Plaintiffs do not meet this requirement because their allegations pertain to Sinclair's conduct in negotiations with DOJ, but the loss-causing event was Chairman Pai's statement concerning undisclosed entanglements between Sinclair and their proposed divestiture partners in FCC proposals. Not only did Sinclair's FCC proposals postdate the Oaktree Offering, they are also separate and distinct statements from those made to DOJ. Accordingly, any loss that resulted from Chairman Pai's disclosure could not be caused by Sinclair's negotiations with DOJ. Therefore, the amended complaint does not adequately plead loss causation.

Given that the Plaintiffs failed to plead Oaktree's possession of MNPI, fiduciary duty, scienter, or loss causation, the Court grants the motion to dismiss Count II. "[B]ecause the plaintiffs have not adequately alleged the direct liability of any defendant, their § 20(a) claim" in Count III is also dismissed. *Pugh*, 521 F.3d at 698.

### III. Morgan Stanley's Motion to Dismiss

The Plaintiffs brought an independent cause of action against Morgan Stanley for violations of Section 12(a)(2) of the Securities Act (Count V). To state a claim under Section 12(a)(2), a "plaintiff must show that defendants offered or sold a security to the plaintiff by means of a prospectus or oral communication that was false or

misleading with respect to material facts." *Lawrence E. Jaffe Pension Plan v. Household Intern., Inc.*, 2004 WL 574665, *15 (N.D. Ill. 2004); 15 U.S.C. 77k(a)(5). However, a defendant is not liable if he or she "did not know and could not have reasonably discovered that the statement was false." *Id.*

Morgan Stanley urges the Court to dismiss Count V because the Plaintiffs do not have standing to assert a claim under Section 12(a)(2). Further, Morgan Stanley maintains that: (1) the Plaintiffs failed to plead that there was a false or misleading statement in any prospectus or oral communication used by Morgan Stanley to buy or sell Tribune stock and (2) the Plaintiffs' amended complaint alleges facts to prove the affirmative defense of loss causation. The Court addresses each argument in turn.

**A. Standing**

To have standing to assert a Section 12(a)(2) claim, the plaintiff must be a "purchaser of securities offered in the prospectus," and the purchase "must be from an initial public offering." *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 2005 WL 2284285, *13 (N.D. Ill. 2005). The Supreme Court clarified that such a purchase must be from a statutory seller, meaning an entity that either passes title to the plaintiff or solicits the sale. *Pinter v. Dahl*, 486 U.S. 622, 642–43 (1988).

Morgan Stanley claims that the Plaintiffs do not meet the standing requirements "because none of them has alleged that they purchased Tribune stock from Morgan Stanley in the Oaktree Offering." The Court disagrees. In the amended complaint, the Plaintiffs allege, "Morgan Stanley sold Tribune common stock pursuant to Offering

Materials directly to Plaintiffs and other members of the Class." They also allege, "Morgan Stanley transferred title to Tribune stock to Plaintiffs and other members of the Class who purchased such stock in the Oaktree Offering…." Finally, the Plaintiffs plead, "Morgan Stanley also solicited the purchase of Tribune stock in the Oaktree Offering by Plaintiffs and other members of the Class who purchased in the Oaktree Offering by means of the Offering Materials…." These allegations show that both the Plaintiffs and members of the Class purchased Tribune stock in the Oaktree Offering from Morgan Stanley and that Morgan Stanley solicited such purchase, which is sufficient to give the Plaintiffs standing under Section 12(a)(2).

Morgan Stanley rightfully expressed concern over the Plaintiffs' allegation that "Morgan Stanley…transferred title of such Tribune Stock to other underwriters or broker-dealers that sold that stock." The Court agrees that this allegation would not suffice for standing purposes, as Section 12(a)(2) does not confer standing on an after-market purchaser. *Ong*, 2005 WL 2284285 at *13–14. To the extent that any of the Plaintiffs or class members base their standing on this allegation, they would not have proper standing under Section 12(a)(2). The remaining Plaintiffs and class members, however, have standing to proceed.

### B. False or Misleading Statement

With respect to pleading deficiencies, Morgan Stanley first argues that the Plaintiffs have not alleged a false or misleading statement in any prospectus or oral communication used by Morgan Stanley to offer or sell Tribune stock. The Court

agrees for the same reasons stated in our analysis of the Registration Statement and Prospectus as to the Tribune and Director Defendants. The descriptions of the obligations under the Merger Agreement are "accurate statements of historical fact," and as such "are not actionable." *Anderson*, 140 F. Supp. 2d at 909. The context of the statements confirms that conclusion, as the accompanying cautionary statements say the descriptions make no representation of the parties' intentions or actions. Further, any predictions as to the merger's closing date are protected forward-looking statements under the PSLRA's Safe Harbor provision, as discussed in Section I.A.

### C. Loss Causation

Finally, Morgan Stanley alleges that the amended complaint establishes the affirmative defense of loss causation. Although the Plaintiffs do not need to plead loss causation as an element of their Section 12(a)(2) claim, *Premier Capital Mgmt., LLC v. Cohen*, 2008 WL 4378300, *14 (N.D. Ill. 2008), "a plaintiff can plead himself or herself out of court by alleging facts showing there is no viable claim." *Abrams v. Van Kampen Funds, Inc.*, 2002 WL 1160171, *5 (N.D. Ill. 2002); *See also Stafford v. Bakke*, 2005 WL 1656855, *5 (S.D. Ind. 2005) (finding that plaintiffs' complaint pled the affirmative defense of loss causation).

As detailed above, "there must be a causal connection between the material misrepresentation and the loss, not simply that the misrepresentation touches upon a later economic loss." *Tricontinental*, 475 F.3d at 843. The Plaintiffs' allegations make clear that no loss causation exists here. As Morgan Stanley correctly states:

> Plaintiffs' alleged loss could not have resulted from any purported misstatement in the Offering Documents. … [T]he supposedly "corrective" July 2018 statement by FCC Chairman Pai about divestiture applications made by Sinclair *after* the November 2017 offering could not possibly have revealed information that Tribune had misrepresented *prior* to the offering.

1:18-cv-6175, Dkt. 83-1 at 4 (emphasis in original). Not only did the "corrective" information not exist at the time of the Oaktree Offering, but it did not pertain to the same regulatory obstacles about which the Plaintiffs sought disclosure. Any information Morgan Stanley allegedly failed to disclose regarding Sinclair's negotiations with DOJ is discrete from its later proposals to the FCC. Therefore, the amended complaint pleads the affirmative defense of loss causation, so this claim must fail.

Given the Plaintiffs' failure to plead a false or misleading statement and their successful, yet unintentional, pleading of the affirmative defense of loss causation, the Court grants the motion to dismiss Count V.

## CONCLUSION

For the aforementioned reasons, the Court grants the Defendants' motions to dismiss with prejudice. It is so ordered.

Dated: 1/7/2020

_Charles P. Kocoras_
Charles P. Kocoras
United States District Judge